# EXHIBIT 2



# National Casualty Company

Home Office:

Madison, Wisconsin

Administrative Office:

8877 North Gainey Center Drive • Scottsdale, Arizona 85258

1-800-423-7675

A STOCK COMPANY

**FINANCIAL SERVICES
PROFESSIONAL LIABILITY
INSURANCE POLICY**

**(Claims Made and Reported)**

**CERTIFICATE
POLICY**

Administered By:

ProSurance Group, Inc.

2685 Marine Way, Suite 1408

Mountain View, California  94043

LIMITATION OF COVERAGE ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

A. In consideration of the premium charged, and not withstanding any other provision of this policy, it is understood and agreed that the coverage provided by this policy, including any obligation to pay "damages", defend or pay "defense costs", is limited to liability arising out of a named insured acting as follows as specified for that named insured on the Named Insureds Endorsement:

I – "Individual" Coverage.  Provides coverage for an "individual" named insured acting as a "life insurance agent" and/or "property and casualty insurance agent" and/or Series 6 "registered representative" as set forth for that named insured on the Named Insureds Endorsement; or

II – Agency Coverage.  Provides coverage for a named insured insurance agency and its employed and independent contractor named insured agents, acting as a "life insurance agent" and/or "property and casualty insurance agent" and/or Series 6 "registered representative" as set forth for that named insured on the Named Insureds Endorsement; provided, coverage for an employee or independent contractor of a named insured agency only applies with respect to covered activities carried out by, or through, or with the written approval of that named insured agency.

B. In consideration of the premium charged, it is understood and agreed that Section VI N of the policy is amended to read as follows:

VI N.   Certain Investments / Investment Strategies / Tangible Assets / Businesses and Activities.   Except as may otherwise be specifically provided by endorsement, it is understood and agreed that there is no coverage under this policy, including no obligation to pay "damages", defend or pay "defense costs", for any insured with respect to any liability or "written claim" based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving actual or alleged advice, offering, sale or servicing of "financial services" with respect to any of the following:

1. Actual or alleged "financial services" related to any of the following named investments or investment strategies including, without limitation, the sale, servicing, advice with respect to or recommendation of any such investments or investment strategies:

- arbitrage;

- short sales (except short against the box);

- derivatives, including, without limitation, interest rate swaps, collateralized mortgage obligations (CMO's), collateralized debt obligations (CDO's), structured notes, commodities, or any type of option or future, or futures option contract (including, without limitation, the purchase, acquisition, sale, holding of or change in value of any "security" or other asset or property obtained as a result of such option or futures contract) or similar investments or investment products including, without limitation, commodity pools or partnerships engaged in the investment in or trading of such "securities";

- charitable gift annuities;

- hedge funds;

- callable, step-up or step-down Certificates of Deposit (CD's);

- viaticals, viatical settlement contracts, senior settlements, senior settlement contracts, structured cash flows (aka pension viaticals), life settlements, life settlement contracts, life settlement backed "securities", death bonds or similar products or services, regardless of how denominated, involving the purchase, sale, assignment, transfer, devise or bequest of all or any portion of the death benefit or other benefits or ownership interests in a life insurance policy, life insurance contract, or annuity, including, without limitation, sale by an owner of a life insurance policy, or the benefits of a life insurance policy, to another "individual" or "entity" whether directly or indirectly, including without limitation, pursuant to any type of option;

LIMITATION OF COVERAGE ENDORSEMENT

Page 2

- Promissory notes and anything similar, whether a "security" or not; provided, U.S. Treasury and any other government agency notes are not excluded from coverage under this policy;
- high yield investment programs (HYIPS) or similar investment programs involving unregistered "securities" typically touted by unlicensed "individuals" or "entities" over the internet (as discussed in the FINRA July 2010 investor alert);
- "securities" which are not registered with the SEC (other than federal, state or municipal "securities" exempt from registration);
- Like-kind exchanges under Internal Revenue Section 1031, including but not limited to tenants-in-common real estate or other investments utilized or planned to be utilized in the exchange or invested in independent of an exchange (except as provided by endorsement);
- private equity investments, including, without limitation, venture capital and leveraged buy-out funds;
- proprietary products;
- day trading;
- tax liens, tax deeds and government secured tax certificates or similar products;
- investments in ATM or pay telephones, including, without limitation, ETS pay phones;
- inverse and leveraged mutual funds and inverse and leveraged Exchange Traded Funds (ETF's) and Exchange Traded Notes (ETN's);
- prepaid variable forward contracts;
- claims arising out of any "trading error" (the failure to buy, sell or otherwise deal with "securities" as requested or intended) ;
- claims arising out of abusive tax shelters or other tax avoidance schemes which have been disallowed by the IRS, including, without limitation, springing cash value life insurance policies;
- structured settlements;
- insurance written through "entities" which are not properly licensed as admitted insurance companies except as otherwise provided under the Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement;
- Corporate Owned Life Insurance policies ("COLI policies") and Bank Owned Life Insurance policies ("BOLI policies") except as otherwise provided by the COLI / BOLI Endorsement; provided, the use of death benefits as collateral for a loan made by a bank to an "individual" is not considered a COLI policy or BOLI policy;
- life insurance policies and annuities the premium for which is financed by a third party "individual" or "entity" rather than being paid for directly by the insured or by a "related person" of that insured"; provided, the use of an "individual's" own assets as collateral for a loan (e.g., mortgaging a home or a margin loan from a stock portfolio), the proceeds of which are being used to buy a life insurance policy, does not constitute "financing of life insurance policies and annuities the premium for is financed by a third party";
- Limited Partnerships and REITS;
- policies placed in or through captive insurers, risk retention groups or purchasing groups;
- claims arising out of or in any way related to the actual or alleged sending, transmitting, communicating, or distribution or use of material or information in violation of any law, rule or regulation (whether local, state, federal or non-USA laws, rules or regulations), including, without limitation, those laws, rules or regulations prohibiting unsolicited faxes, text messages, electronic mail, or any other unwanted or unsolicited communications, including, without limitation, The Telephone Consumer Protection Act and The CAN-Spam Act, as amended, and the rules and regulations adopted pursuant to those Acts, as well as any laws, rules or regulations dealing with privacy, cyber stalking and cyber harassment;
- investments in tangible personal property, whether directly or through a "security" conveying ownership or an interest therein, including, without limitation, pay telephones, automatic teller machines ("ATM's"), precious metals, gemstones, stamps, art objects, antiques or other collectibles or any security interest in tangible personal property; however, this exclusion does not apply to claims arising out of transactions involving gold or silver;
- Investments in or the use of cryptocurrency, including but not limited to Digital Tokens and Digital Coins, e.g. Bitcoin, Ethereum, Litecoin, Zcash, Dash, Ripple, and Monero, whether obtained in an Initial Coin Offering, through an exchange or otherwise;

LIMITATION OF COVERAGE ENDORSEMENT

Page 3

- Investments obtained through or the use of crowdfunding, including but not limited to, peer-to-peer lending, initial coin offerings, and equity crowdfunding, whether in compliance or not with Title III of the Jumpstart Our Business Startups Act and its regulations; and
- any other investments or investment strategies excluded elsewhere in this policy, including, without limitation, an endorsement and SECTION VI.

2. Actual or alleged "financial services" related to any of the following named businesses or activities, or any "written claim" or liability arising out of or in connection with any such businesses or activities:

- acting as a "life insurance agent", "property and casualty insurance agent" or Series 6 "registered representative" except as provided in A. above;
- acting a "registered investment adviser" or "financial planner";
- providing or arranging for the provision of premium financing for life insurance policies;
- claims arising out of the actual or alleged commingling of funds, or the inability or failure to pay, collect or safeguard funds;
- the publication of periodicals or newsletters;
- underwriting of policies or settlement of claims;
- any subsidiary, parent or "affiliate" of an insured which is not specifically named or referred to as an insured on this policy, as well as any claims made by any of them or in any way related to any of their products or services; no insured will be covered while acting as, or with respect to any liability he/she may have as a result of any capacity he/she may have with respect to any of the above, including, without limitation, owner, officer, director, shareholder, member, partner, employee, or independent contractor; and
- those businesses or activities excluded elsewhere in this policy, including, without limitation, an endorsement and SECTION VI.

This policy will be void from inception, and of no force or effect with regard to any terms or conditions that violate any laws or regulations of the United States concerning economic or trade embargos.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-m11 (12-17)

OTHER INSURANCE ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including no obligation to defend or pay "defense costs" or indemnify any insured, if there is any other valid and collectible insurance available to the insured, including without limitation, the following named policy, if any, and any insurance under which there is a duty to defend, unless such insurance is written to be excess over this specifically identified policy.  For example, if an insured is a "life insurance agent" and "registered representative", and he/she is also an insured under a policy covering "life insurance agents" for his variable annuity sales, this policy would not apply to that "registered representative" with respect to "written claims" arising out of variable annuity sales.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-80 (12-10)

LIMITS OF LIABILITY ENDORSEMENT

---

The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy.

First Named Insured:  Participating Insurance Agent Members of the Financial Services Professional Liability Risk Purchasing Group/MGA P-C
Policy Number:  FNO0001616-VA-03-02
Effective Date of This Endorsement:  July 21, 2017

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, it is understood and agreed that Item 5 of the Declarations is amended to read as follows:

Item 5.  Our Limits of Liability under this policy shall be as stated below, subject to all of the terms of this policy having reference thereto.

    A.  Each "Wrongful Act" Aggregate:      See Named Insureds Endorsement for applicable Limits.
        Named Insured Aggregate:      See Named Insureds Endorsement for applicable Limits.
        Policy Aggregate:      $10,000,000.00.

    B.  Provided, the following Sub Limit of Liability applies to the coverage provided to each named insured by the Disciplinary & Subpoena Endorsement:

        Named Insured Aggregate:      $20,000.00 for all the named insured's coverage provided by this endorsement.

    C.  Provided, the following Sub Limits of Liability apply to the coverage provided to each named insured "entity" by the Privacy and Identity Protection Endorsement:

        Named Insured Legal Liability Aggregate:      $15,000.00.
        Named Insured "Defense Costs" Aggregate:      $10,000.00.
        Named Insured Aggregate:      $25,000.00 for all the named insured's coverage provided by this endorsement.

    D.  Provided, the following Sub Limits of Liability apply, in the aggregate, to all coverage for insured types 1A, 1B, 2A and 2B, provided under the Limited Personal Lines Property and Casualty Agent Coverage Endorsement, Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement and Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement combined (except "written claims" arising out of or in any way related to residential or commercial flood or earthquake insurance):

        Each "Wrongful Act" Aggregate:      $1,000,000.00
        Named Insured Aggregate:      $1,000,000.00

    E.  Provided, the following Sub Limits of Liability apply, in the aggregate, to any coverage provided under the Limited Personal Lines Property and Casualty Agent Coverage Endorsement, Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement and Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement with respect to "written claims" arising out of or in any way related to residential or commercial flood or earthquake insurance; the following Sub Limits of Liability also apply to all coverage under the Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement:

        Each "Wrongful Act" Aggregate:      $100,000.00
        Named Insured Aggregate:      $100,000.00
        Policy Aggregate:      $1,000,000.00

        The Each "Wrongful Act" Aggregate and Named Insured Aggregate Sub Limits of Liability set forth immediately above are part of, and not in addition to, the Sub Limits of Limits set forth in paragraph D, above.

        The Policy Aggregate Sub Limit of Liability set forth immediately above is part of, and not in addition to, the Policy Aggregate Limit of Liability set forth in paragraph A, above.

LIMITS OF LIABILITY ENDORSEMENT

Page 2

F.  The Sub Limits of Liability set forth in paragraph B., C., and D., above, are part of, and not in addition to, the applicable Limits of Liability set forth in A., above.  We will not, in any case, pay more than:  $1,000,000.00 Policy Aggregate for all covered "wrongful acts" arising out of or in any way related to advice with respect to, sale or servicing of flood and earthquake insurance as well as all coverage under the Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement; or $10,000,000.00 Policy Aggregate for all "written claims" covered by this policy.  However, the exhaustion of an applicable Policy Aggregate shall not apply to eliminate coverage for a named insured who/which is a resident of the State of New York who /which has a Named Insured Aggregate for that coverage; subject to an applicable Each "Wrongful Act" Aggregate, said named insured's applicable Named Insured Aggregate, if any, shall be fully available to pay "written claims" arising out of his/her covered "wrongful acts" despite the exhaustion of the applicable Policy Aggregate (due, at least in part, to "written claims" which do not involve said insured); provided further, notwithstanding the above, in the event the applicable Policy Aggregate is exhausted due to covered "written claims" (including "written claims" not involving said insured), this policy will not apply, or will not apply further, to any "class action claim" (a claim under which one party, or a group of parties, sue as representatives of a larger class).

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-m13b (11-07)

PENNY STOCK ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that SECTION VI. WHAT WE DO NOT COVER – EXCLUSIONS, paragraph T.  Foreign Trading / Market Specialist / Clearing or Transfer Agencies / "Penny Stocks" is amended by changing "NASDAQ Capital Market Small Cap Market" to its current name, "NASDAQ Capital Market".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-121 (12-10)

INSUREDS ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that SECTION IV of the policy is amended to read as follows:

SECTION IV ---WHO IS INSURED UNDER THIS POLICY

Each of the following is an insured under this policy as set forth below:

1. The Financial Services Professional Liability Risk Retention Group is an insured, but only for its vicarious liability arising out of covered "wrongful acts" committed by a named insured when named as a co-defendant with a named insured.

    The following "Retention" and Sub Limits of Liability apply to the coverage provided to the Financial Services Professional Liability Risk Retention Group:

    | | | |
    |---|---|---|
    | "Retention": | $1,000.00 | Each "Wrongful Act" |
    | Sub-Limits of Liability: | $5,000.00 | Each "Wrongful Act" |
    | | $10,000.00 | Policy Aggregate |

2. Each "individual" named as a named insured on the Named Insureds Endorsement for the coverage indicated for him/her on the Named Insureds Endorsement.

3. Each agency named as a named insured on the Named Insureds Endorsement, together with its employed and independent contractor agents ("life insurance agents", "property and casualty insurance agents" and Series 6 "registered representatives") for the coverage indicated for it, and them, on the Named Insureds Endorsement.

3. Each "entity" qualifying as an additional insured pursuant to the Named Insured Company Endorsement for the coverage provided to such "entity" pursuant to the Named Insured Company Endorsement.

4. The "spouse" of an "individual" named insured, but solely with respect to his/her vicarious liability, arising out of his/her status as the "spouse" of said named insured, as a result of covered "wrongful acts" of said named insured, including, without limitation, "written claims" seeking "damages" recoverable from marital community property, property jointly held by the insured and his/her "spouse" or property transferred from a named insured to his/her "spouse"; provided, there is no coverage under this policy for "written claims" arising out of any actual or alleged "wrongful acts" of said "spouse".

5. The executor, administrator, guardian or other legal representative of a named insured "individual" who dies, becomes incompetent, or bankrupt, but only while acting in his/her capacity as such and with respect to "wrongful acts" for which said deceased, incompetent or bankrupt named insured would otherwise be covered under this policy.


Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.


By: _____
        Authorized Representative

FNX-m6 (2-11)

ADMINISTRATOR ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

      First Named Insured:
      Policy Number:
      Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the coverage provided, it is understood and agreed as follows:

      Gallagher MGA is acting as the administrator of this program on behalf of the participating agents.  As such, it has the responsibilities of the First Named Insured identified in this policy, including, without limitation, paying to us all premium and "retentions" collected and due from the named insureds under the terms of this policy, as well as carrying out those duties and responsibilities of the First Named Insured set forth in Section VII K and N. of this policy and the endorsements to this policy.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                    Authorized Representative

FNX-m8 (11-07)

COLI / BOLI ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

     First Named Insured:
     Policy Number:
     Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed as follows;

A. There  is no coverage under this policy for "written claims" that arise out of or are in any way related to the purchase, sale or servicing of Corporate Owned Life Insurance policies ("COLI policies") and Bank Owned Life Insurance policies ("BOLI policies"); provided, this exclusion shall not apply to the following if, but only if, such insurance is purchased, sold and serviced in full compliance with all state and federal laws and regulations including, without  limitation, the safe harbors established by the IRS:

  1. purchase, sale or servicing of "key person insurance";
  2. purchase, sale or servicing of insurance on an "individual", taken out and owned by an a business "entity" with that "entity" as the beneficiary of that policy, taken out for the purpose of financing non-qualified deferred compensation or salary continuance benefits.

B. The following definition is added to the policy:

"Key person insurance", often referred to as "key man Insurance" or "business succession insurance", means an insurance policy taken out by and owned by a business "entity" to compensate the business "entity" for financial losses that may arise from the death or extended incapacity of an important member of the business.  It includes standard life insurance, TDP insurance or trauma insurance policies used for business succession or business protection purposes. The policy term of such insurance does not extend beyond the period of the key person's usefulness to the business.

C. The use of death benefits as collateral for a loan made by a bank to an "individual" is not considered a COLI policy or BOLI policy.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                      Authorized Representative

FNX-m136b (11-14)

LIFE INSURANCE CONSULTANT ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that the definition of "Life Insurance Agent" in Section I. of this policy is deleted and replaced by the following:

SECTION I – DEFINITIONS:  "Life Insurance Agent"

"Life Insurance Agent" means an "individual" or "entity" who/which is licensed as a life or health insurance agent or broker, as required by law, or is licensed, as required by law, as a fee based life insurance consultant, counselor, or insurance advisor, and who/which is selling or providing advice with respect to life, health, disability and accident insurance and annuity products which, if required to be authorized or approved for sale by a regulatory authority, have been so authorized or approved.  However, it does not include, without limitation, (a) anyone while acting as a general agent or in any similar capacity for a life insurance company if he/she has or supervises sub agents or (b) anyone acting as a risk manager, benefit manager or in any similar capacity with or without decision making authority for an "individual" or "entity."

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

CONTINUOUSLY INSURED DEFINITION ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

      First Named Insured:
      Policy Number:
      Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged and the coverage provided, it is understood and agreed as follows:

Paragraph 2 of the Named Insureds Endorsement is amended to add the following:

Further with regard to an "insured" insured under this policy, who first applied for coverage under this policy, or a predecessor policy for which this is a renewal, and whose expiration date of the then expiring policy at the time of application was in the middle of a month, will be deemed not to have a gap in continuous coverage whether the initial date of coverage under this policy, or a predecessor policy for which this is a renewal, was the first of the month preceding or first of the month after the date of expiration of the "insured's" expiring policy.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

**10.**

HEALTHCARE SHARING MINISTRY ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and subject to the Conditions Precedent to Coverage, Exclusions, Each "Wrongful Act" "Retention", Sub Limits of Liability and "Retroactive Date" set forth below, it is understood and agreed that named insureds under Coverage Option "G" are insureds for "written claims" arising from the sale and servicing of products of the "Healthcare Sharing Ministry" listed below.

A.  Conditions Precedent to Coverage.

    For coverage to apply under this endorsement with respect to a "written claim" of the "HealthCare Sharing Ministy" list below products, each of the following Conditions Precedent to Coverage must apply in the case of that "written claim":

    1.  "Health Care Sharing Ministry" is a health care sharing ministry as defined in Section 5000A(d)(2)(B)(ii)(I)_(V) of the Patient Protection and Affordable Care Act and have a certificate of exemption from the shared responsibility payment under Section 5000A of the Internal Revenue Code at the time of the sale of the "Healthcare Sharing Ministry's" product and the time of the "written claim"; and

    2.  Disclosure forms required by the "Healthcare Sharing Ministry" and HealthMarkets Inc. and or their "affiliates" must have been signed prior to the sale of the "Healthcare Sharing Ministry's" products.

B.  Exclusions.

    The following amended or additional exclusions apply to the coverage provided by this endorsement in addition to those contained in this policy.  This coverage does not apply to:

    1.  Any class action suit involving or in any way related to a "Healthcare Sharing Ministry"; and

    2.  Any "written claim" arising from, involving or in any related to a "Healthcare Sharing Ministry's" statement of belief, life style agreement or similar attestations required of members of a  "Healthcare Sharing Ministry", including, but not limited to, the denial of a medical claim by a "Healthcare Sharing Ministry" due to a violation of such attestation; and

    3.  Any "written claim" arising out  of or related to the actual or alleged insolvency, receivership, bankruptcy, liquidation, reorganization or   financial inability to pay of a "Healthcare Sharing Ministry".

    4.  Any "written claims" arising from, involving or in any related to a member of a "Healthcare Sharing Ministry's" failure to share in other member's medical expenses.

C.  The Each "Wrongful Act" "Retention" applying to the coverage provided by this endorsement is $5,000.00.

D.  The Sub Limits of Liability applying to the coverage provided by this endorsement are as follows:

      Each "Wrongful Act" Aggregate:    $100,000.00

      "Representative" Aggregate:    $100,000.00

      Policy Aggregate    $1,000,000.00

The above Limits of Liability are part of, and not in addition to, the Limits of Liability set forth in the Limits of Liability Endorsement and subject to the conditions stated in the Limits of Liability Endorsement.

HEALTHCARE SHARING MINISTRY ENDORSEMENT

E.  The "retroactive date" applying to the coverage provided by this endorsement is the first date that an "insured" covered under Coverage Option "G" has been continuously insured, up to his/her/its Coverage Inception Date for professional liability coverage (errors and omissions coverage) for "wrongful acts" involving or relating to "Healthcare Sharing Ministry" products.

F.  "Healthcare Sharing Ministry":  Christian Care Ministry Inc. (aka Medi-Share) and Aliera Healthcare Inc.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

INSURANCE COMPANY INSOLVENCY ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that Section VI I is amended to read as follows:

I.      Insolvency or Bankruptcy.

We do not cover claims which arise out of the actual or alleged insolvency, receivership, bankruptcy, liquidation, reorganization or financial inability to pay of any: insured; bank or banking firm; trust, title or escrow company; law firm; "broker" or "dealer"; clearing agency; insurance company or re-insurer or pool, syndicate, association or other combination formed for the purpose of providing insurance, self-insurance or reinsurance; provided this exclusion shall not apply with respect to an insurance company if that insurance company is rated "B+" or higher by A.M. Best Company at the time of placement of insurance.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                    Authorized Representative

FNX-66a (12-07)

## LEVEL FUNDED HEALTH PLANS ENDORSEMENT
(Financial Services)

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

     First Named Insured:
     Policy Number:
     Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that the definitions of "Financial Planning Services" and Life insurance agent" in Section I – Definitions are deleted and replaced by the following for "wrongful acts" on or after the retroactive date below:

"Financial services" means the provision of:  "financial planning services" by a "financial planner"; "investment management services" by a "registered investment adviser" or an "associated person" of a "registered investment adviser"; the purchase or sale of "securities" or the provision of "investment advice" by a "registered representative"; and the proposed sale or sale of products authorized to be sold by a properly licensed "life insurance agent", including, without limitation, life, health, disability and accident insurance products, annuities and "level funded health plans"; provided, "financial services" does not include any advice with respect to or the sale of viatical products.

"Life insurance agent" means an "individual" or "entity" who/which is licensed, as required by law, to sell life, health, disability and accident insurance, annuity products and "level funded health plans",  and who / which is selling or providing advise with respect to such products which, if required to be authorized or approver for sale by a regulatory authority, has been so authorized or approved; however, it does not include, without limitation, anyone while acting as a general agent or in any similar capacity for a life insurance company if he/she has or supervises any sub agents.

"Level funded health plan" is a self-insured hybrid plan providing health coverage to small businesses. Its monthly costs remain level throughout the policy period and consist of three pools to pay:

    a.  employee health claims;

    b.  plan administrative cost; and

    c.  stop-loss insurance;

where unused portions of the pool to pay employee health claims may be returned to the insured.  The plan is offered and administered by an insurance company rated A- or better by A. M. Best and contain both individual and aggregate stop-loss insurance.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                  Authorized Representative

INCIDENT REPORT ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed as follows:

A. An incident or "client" complaint involving an alleged or possible "wrongful act", occurring on or after the insured's "retroactive date" under this endorsement and otherwise covered by this policy, which is reported to us, as set forth below, during the insured's "policy period" and which subsequently becomes the subject of a "written claim" reported to us following expiration of the insured's "policy period", shall be considered to have been reported to us as set forth in B., below, if:

   1. there is sufficient written documentation, reported to us with the incident or complaint, to allow us to determine that the subsequently reported "written claim" arises from the same facts as said incident or complaint; for coverage to apply, such written documentation must include, at a minimum, the following:
      a. the name(s) of potential claimant(s) and a description of the specific "wrongful act" which forms the basis of a potential "written claim";
      b. the identity of the specific insured(s) involved in such "wrongful act"; and
      c. the consequences which have resulted or may result from such "wrongful act"; and
      d. the amount of monetary loss which may be sought as a consequence of such "wrongful act"; and
      e. the circumstances under which the insured first became aware of such "wrongful act; and
   2. there is no other insurance coverage available to said insured that applies to said "written claim", or which would apply in absence of this policy.

B. 1. If coverage for the insured is not renewed by us, and if an incident or complaint, previously reported to us as aforesaid, becomes the subject of a "written claim" reported to us by the insured following expiration of the insured's "policy period", such "written claim" shall be considered to have been reported to us on the date such incident or complaint was previously reported to us during the insured's "policy period" and shall be subject to all the terms and conditions of the insured's coverage in force when such incident or complaint was first reported to us, including without limitation, the applicable Limits of Liability and "retention" applying under that policy.

   2. If coverage for the insured is renewed by us, and if an incident or complaint, previously reported to us as aforesaid, becomes the subject of a "written claim" reported to us by the insured under such renewal policy, or one of a series of continuously renewed policies covering for the insured, such "written claim" shall be considered to have been reported to us on the date the "written claim" is reported to us during the insured's renewal "policy period"; provided, such "written claim" shall be subject to all the terms and conditions of the insured's coverage in force when such incident or complaint was first reported to us under the prior policy, including, without limitation, the applicable Limits of Liability and "retention" applying under that policy.

C. A report made to us by an insured, including without limitation a report for loss control or risk management purposes, shall not be considered a "written claim".

D. There is no coverage under this endorsement for  a named insured with respect to incidents occurring prior to the named insured's Effective Date of Coverage under this insurance Program as shown on the Named Insureds Endorsement.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

LIMITED PERSONAL LINES PROPERTY AND CASUALTY AGENT COVERAGE ENDORSEMENT
(Applies to Coverage Options "D", "D-1" and "D-2")

---

The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy.

      First Named Insured:
      Policy Number:
      Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, and subject to the Sub Limits of Liability, "Retention" and additional exclusions set forth below, it is understood and agreed as follows:

1.  If the Named Insureds Endorsement shows that a named insured has coverage for acts as a property and casualty insurance agent, broker or solicitor with respect to the sale and servicing of personal lines insurance products, this policy applies to that named insured's activities as a properly licensed property and casualty insurance agent, broker or solicitor with respect to the sale or servicing of the following personal lines insurance products only:  homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood insurance with respect to property and casualty insurance risks written through admitted insurance carriers and involving risks located within the "policy territory"; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the named insured must have complied with his/her/its state's statutory and regulatory requirements involving flood insurance.

2.  The coverage provided by this endorsement does not apply to the any of the following claims:

    a.  any claim alleging, arising out of, based upon or attributable to any prior claim, "suit" or litigation (including without limitation any form of alternative dispute resolution) or any claim, "suit" or litigation pending as of the inception of coverage hereunder for the named insured, or alleging or derived from the same or essentially the same facts as alleged in such prior or pending claim, "suit" or litigation;

    b.  any claim, or that portion of any claim, seeking non-pecuniary relief (e.g., specific performance or injunction);

    c.  any claim based upon, arising out of, due to or involving, directly or indirectly, the insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any insurance company, self-insurance trust, group insurance trust, or other risk-assuming "entity";

    d.  any claim brought about or contributed to by any commingling of funds or accounts or the failure to safeguard any moneys, or any claim for sums received by an insured or credited to an insured's account, or any claim for fees, premiums, taxes, commissions, or brokerage moneys which an insured collected or should have collected, returned or should have returned, or paid or should have paid on behalf of another person or organization;

    e.  any claim arising out of a notarized certification or acknowledgment of a signature where the person who is or claims to be the person signing said instrument was not physically present before such notary public at the time of said notarization;

    f.  any claim arising out of or connected in any way with the insured's activities as a general agent, managing general agent, program manager or administrator, surplus lines broker, wholesale insurance broker, captive insurer or risk retention group manager, or notary public, or arising in connection with claims adjusting and/or loss control services;

    g.  any claim based upon, or directly or indirectly arising out of or resulting from the placement of, or actual or alleged failure to place, reinsurance; the performance of, or actual or alleged failure to perform, any actuarial service or loss control or risk management service; or any  advice relating to mergers or acquisitions;

    h.  any claim arising out of the insured's activities as an officer, director, partner, trustee, employee or consultant of any insurance company, self-insurance plan, risk retention group, insurance pool, reciprocal or captive insurer or other risk-assuming organization or "entity";

    i.  any claim arising out of the insured's services rendered after the suspension or revocation of the insured's agent's, broker's or solicitor's license;

    j.  any claim based upon, arising out of, resulting from, or in any way related to insurance placed with a captive insurance company, multiple employer health plan, risk retention group, purchasing group, insurance company rated less than B+ by A.M. Best, alien or non-admitted insurer (except as otherwise provided under Coverage F), or any self-insurance pool, trust or other "entity" not regulated by a state department of insurance;

LIMITED PERSONAL LINES PROPERTY AND
CASUALTY AGENT COVERAGE ENDORSEMENT

Page 2

k. any claim based upon, arising out of, resulting from, or in any way related to any insurance products or lines of insurance other than those listed in paragraph 1, above, including, without limitation, the following insurance products or lines of insurance: workers compensation and employer's liability, general liability, products liability, commercial multi-peril, business owner's policy, commercial automobile, commercial property, commercial flood, earthquake, aircraft, ocean or inland marine, professional liability, medical malpractice, directors and officers liability, employment practices liability, fidelity, surety, boiler and machinery, kidnap and ransom, reinsurance, international insurance, crop, hail, wind, earthquake, or pollution; any claim based upon, arising out of, resulting from, or in any way related to any policies placed in or through captive insurers, risk retention groups or purchasing groups;

l. any claim based upon, arising out of, resulting from, or in any way related to any insurance product or quasi insurance product which has not been approved, as required, by the proper insurance authorities in the state or territory in which it was sold;

    a. any claim or cause of action arising out of a class action lawsuit;

    b. any claim based upon, arising out of, resulting from or in any way related to any actual or alleged failure to provide loss control and risk management services.

3. The Each "Wrongful Act" "Retentions" applying to "written claims" covered by this endorsement are as follows:

"Written claims" arising solely out of advice with respect to or the sale or servicing of covered personal lines insurance products other than residential flood:  $5,000.00 Each "Wrongful Act".

"Written claims" arising out of advice with respect to, or the sale or servicing of residential flood insurance, whether alone or involving other covered insurance products:  $25,000.00   Each Claimant.

4. The following Sub Limits of Liability apply, in the aggregate, to the coverage provided by this endorsement and the Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement combined:

| | |
|---|---|
| Each "Wrongful Act" Aggregate: | $1,000,000.00 |
| Named Insured Aggregate: | $1,000,000.00 |

Provided, the following Sub Limits of Liability apply to "written claims" arising out of or in any way related to residential or commercial flood or earthquake insurance:

| | |
|---|---|
| Each "Wrongful Act" Aggregate: | $100,000.00 |
| Named Insured Aggregate: | $100,000.00 |
| Policy Aggregate: | $1,000,000.00 |

These Sub Limits of Liability are part of, and not in addition to, the applicable Limits of Liability applying to the named insured as set forth in the Named Insured and Limits of Liability Endorsements.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

LIMITED PERSONAL AND COMMERCIAL LINES
PROPERTY AND CASUALTY AGENT COVERAGE ENDORSEMENT
(Applies to Coverage Option "E")

| The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy. |
|---|
| First Named Insured: |
| Policy Number: |
| Effective Date Of This Endorsement: |

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, and subject to the Sub Limits of Liability, "Retentions" and additional exclusions set forth below, it is understood and agreed as follows:

1.  If the Named Insureds Endorsement shows that a named insured has coverage for acts as a property and casualty insurance agent, broker or solicitor, with respect to the sale or servicing of the personal and commercial lines insurance products, this policy applies to that named insured acting as a properly licensed property and casualty insurance agent, broker or solicitor with respect to advice on, sale and servicing of the personal and commercial lines insurance products listed below in paragraphs 2 and 3 with respect to property or casualty insurance risks located within the "policy territory" and written through admitted insurance carriers.

2.  Coverage provided by this endorsement applies to the following personal lines insurance coverage or products only: homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood; provided further, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

3.  The coverage provided by this endorsement with respect to commercial lines insurance coverage or products applies only to the following lines of insurance: workers compensation and employers' liability, general liability, products liability, commercial multi-peril, business owner's policy, commercial automobile (other than long haul trucking which is not covered), commercial property and commercial flood; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

4.  The coverage provided by this endorsement does not apply to the any of the following:

    a.  any claim alleging, arising out of, based upon or attributable to any prior claim, "suit" or litigation (including without limitation any form of alternative dispute resolution) or any claim, "suit" or litigation pending as of the inception of coverage hereunder for the named insured, or alleging or derived from the same or essentially the same facts as alleged in such prior or pending claim, "suit" or litigation;

    b.  any claim, or that part of any "written claim" seeking non-monetary relief (e.g. specific performance or injunction);

    c.  any claim based upon, arising out of, due to or involving, directly or indirectly, the insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any insurance company, self-insurance trust, group insurance trust or other risk-assuming "entity";

    d.  any claim brought about or contributed to by any commingling of funds or accounts or the failure to safeguard any moneys, or any claim for sums received by an insured or credited to an insured's account, or any claim for fees, premiums, taxes, commissions, or brokerage moneys which an insured collected or should have collected, returned or should have returned, or paid or should have paid on behalf of another "person", organization or "entity";

    e.  any claim arising out of a notarized certification or acknowledgment of a signature where the person who is or claims to be the person signing said instrument was not physically present before such notary public at the time of said notarization;

    f.  any claim arising out of or connected in any way with an insured's activities as a general agent, managing general agent, program manager or administrator, surplus lines broker, wholesale insurance broker, captive insurer or risk retention group manager, or notary public, or arising in connection with claims adjusting and/or loss control services;

LIMITED PERSONAL AND COMMERCIAL LINES
PROPERTY AND CASUALTY AGENT COVERAGE ENDORSEMENT

Page 2

g.  any claim based upon, or directly or indirectly arising out of or resulting from: the placement of, or actual or alleged failure to place, reinsurance; the performance of, or actual or alleged failure to perform, any actuarial service or loss control or risk management service; or any advice relating to mergers or acquisitions;

h.  any claim arising out of an insured's activities as an officer, director, partner, trustee, employee or consultant of any insurance company, self-insurance plan, risk retention group, insurance pool, reciprocal or captive insurer or other risk-assuming organization or "entity";

i.  any claim arising out of an insured's services rendered after the suspension or revocation of the insured's agent's, broker's or solicitor's license;

j.  any claim based upon, arising out of, resulting from, or in any way related to insurance placed or through with a captive insurance company, multiple employer health plan, risk retention group, purchasing group, insurance company rated less than B+ by A.M. Best, alien or non-admitted insurer (except as otherwise provide under Coverage F), or any self-insurance pool, trust or other "entity" not regulated by a state department of insurance;

k.  any claim based upon, arising out of, resulting from, or in any way related to any insurance products or lines of insurance other than those listed in paragraphs 2 and 3, above, including, without limitation, the following insurance products or lines of insurance: aircraft, ocean or inland marine, professional liability, medical malpractice, directors and officers liability, employment practices liability, fidelity, surety, boiler and machinery, kidnap and ransom, reinsurance, international insurance, crop, hail, wind, earthquake, or pollution;

l.  any claim based upon, arising out of, resulting from, or in any way related to any insurance product or quasi insurance product which has not been approved, as required, by the proper insurance authorities in the state or territory in which it was sold;

    a.  any claim or cause of action which has been or is the subject of a class action lawsuit.

    b.  any claim based upon, arising out of, resulting from or in any way related to any actual or alleged failure to provide loss control and risk management services.

5.  The Each "Wrongful Act" "Retentions" applying to "written claims" covered by this endorsement are as follows:

Claims arising solely out of the sale or servicing of covered personal lines insurance products other than residential flood:  $5,000.00 Each "Wrongful Act.

Claims arising out of the sale or servicing of commercial lines insurance products, or both commercial and personal lines insurance products covered by the same "written claim" (other than flood):  $10,000.00 Each "Wrongful Act".

Claims arising out of the sale or servicing of residential and commercial flood insurance, whether alone or involving other covered insurance products:  $25,000.00 Each Claimant.

6.  The following Sub Limits of Liability apply, in the aggregate, to the coverage provided by this endorsement and the Limited Personal Lines Property and Casualty Agent Coverage Endorsement combined:

    Each "Wrongful Act" Aggregate:                $1,000,000.00
    Named Insured Aggregate:                  $1,000,000.00

    Provided, the following Sub Limits of Liability apply to claims, arising out of or in any way related to residential or commercial flood and earthquake insurance:

    Each "Wrongful Act" Aggregate:                $100,000.00
    Named Insured Aggregate:                    $100,000.00
    Policy Aggregate:                            $1,000,000.00

    These Sub Limits of Liability are part of, and not in addition to, the applicable Limits of Liability set forth in the Named Insured and Limits of Liability Endorsements.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

EXPANDED COMMERCIAL LINES
PROPERTY AND CASUALTY AGENT COVERAGE ENDORSEMENT
(Applies to Coverage Option "F")

---

The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy.

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, and subject to the Sub Limits of Liability, "Retentions", Condition Precedent to Coverage and additional exclusions set forth below, it is understood and agreed as follows:

1. If the Named Insureds Endorsement shows that a named insured has chosen the option of Expanded Commercial Lines Insurance in addition to his/her/its coverage under the Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement, his/her/its coverage is expanded to include the following:

   a. Inland marine, cyber liability, medical malpractice and professional liability, directors and officers liability, employment practice liability, fidelity, surety, crop, hail, wind and earthquake insurance written through both admitted and non-admitted insurance carriers; provided, for coverage to apply with respects to claims arising out of or related in any way to earthquake insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving earthquake insurance.

   b. Personal lines homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood written through non-admitted insurance carriers; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

   c. Commercial lines workers compensation and employers' liability, general liability, products liability, commercial multi-peril, business owner's policy, commercial automobile (other than long haul trucking which is not covered), commercial property and commercial flood; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

2. Coverage under this endorsement is subject to the following Conditions Precedent to Coverage:

   a. Any non-admitted insurance written by a named insured must be obtained through a licensed surplus lines broker who/which is not affiliated with that named insured or his/her employer.
   b. No more than 10% of the named insured's "total commission and fee income" can be derived from the products and services covered by this endorsement.

   If either of these Conditions Precedent to Coverage is not met, there will be no coverage under this endorsement.

3. The coverage provided by this endorsement does not apply to the any of the following:

   a. any claim alleging, arising out of, based upon or attributable to any prior claim, "suit" or litigation (including without limitation any form of alternative dispute resolution) or any claim, "suit" or litigation pending as of the inception of coverage hereunder for the named insured, or alleging or derived from the same or essentially the same facts as alleged in such prior or pending claim, "suit" or litigation;

   b. any claim, or that part of any "written claim"  seeking non-monetary relief (e.g. specific performance or injunction);

EXPANDED COMMERCIAL LINES
PROPERTY AND CASUALTY AGENT COVERAGE ENDORSEMENT

Page 2

c.  any claim based upon, arising out of, due to or involving, directly or indirectly, the insolvency, receivership, bankruptcy, liquidation or financial inability to pay, of any insurance company, self-insurance trust, group insurance trust or other risk-assuming "entity";

d.  any claim brought about or contributed to by any commingling of funds or accounts or the failure to safeguard any moneys, or any claim for sums received by an insured or credited to an insured's account, or any claim for fees, premiums, taxes, commissions, or brokerage moneys which an insured collected or should have collected, returned or should have returned, or paid or should have paid on behalf of another "person", organization or "entity";

e.  any claim arising out of a notarized certification or acknowledgment of a signature where the person who is or claims to be the person signing said instrument was not physically present before such notary public at the time of said notarization;

f.  any claim arising out of or connected in any way with an insured's activities as a general agent, managing general agent, program manager or administrator, surplus lines broker, wholesale insurance broker, captive insurer or risk retention group manager, or notary public, or arising in connection with claims adjusting and/or loss control services;

g.  any claim based upon, or directly or indirectly arising out of or resulting from: the placement of, or actual or alleged failure to place, reinsurance; the performance of, or actual or alleged failure to perform, any actuarial service or loss control or risk management service; or any advice relating to mergers or acquisitions;

h.  any claim arising out of an insured's activities as an officer, director, partner, trustee, employee or consultant of any insurance company, self-insurance plan, risk retention group, insurance pool, reciprocal or captive insurer or other risk-assuming organization or "entity";

i.  any claim arising out of an insured's services rendered after the suspension or revocation of the insured's agent's, broker's or solicitor's license;

j.  any claim based upon, arising out of, resulting from, or in any way related to insurance placed or through with a captive insurance company, multiple employer health plan, risk retention group, purchasing group, insurance company rated less than B+ by A.M. Best, alien or non-admitted insurer, or any self-insurance pool, trust or other "entity" not regulated by a state department of insurance;

k.  any claim based upon, arising out of, resulting from, or in any way related to any insurance products or lines of insurance other than those listed in paragraph 1, above, including, without limitation, the following insurance products or lines of insurance:  aircraft, ocean or inland marine, professional liability, medical malpractice, directors and officers liability, employment practices liability, fidelity, surety, boiler and machinery, kidnap and ransom, reinsurance, international insurance and pollution;

l.  any claim based upon, arising out of, resulting from, or in any way related to any insurance product or quasi insurance product which has not been approved, as required, by the proper insurance authorities in the state or territory in which it was sold;

m.  any claim or cause of action which has been or is the subject of a class action lawsuit.

n.  any claim based upon, arising out of, resulting from or in any way related to any actual or alleged failure to provide loss control and risk management services.

5.  The "Retentions" applying to "written claims" presented for coverage under this endorsement are as follows:

Claims arising out of or in any way related to the sale or servicing of residential or commercial flood insurance or earthquake insurance, whether alone or involving other covered insurance products:  $25,000.00 Each Claimant.

All other "written claims":  $25,000.00 Each "Wrongful Act".

EXPANDED COMMERCIAL LINES
PROPERTY AND CASUALTY AGENT COVERAGE ENDORSEMENT

Page 3

6. The following Sub Limits of Liability apply, in the aggregate, to the coverage provided by this endorsement, the Limited Personal Lines Property and Casualty Agent Coverage Endorsement and the Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement combined:

| | |
|---|---|
| Each "Wrongful Act" Aggregate: | $1,000,000.00 |
| Named Insured Aggregate: | $1,000,000.00 |

Provided, the following Sub Limits of Liability apply to claims, arising out of or in any way related to residential or commercial flood and earthquake insurance:

| | |
|---|---|
| Each "Wrongful Act" Aggregate: | $100,000.00 |
| Named Insured Aggregate: | $100,000.00 |
| Policy Aggregate: | $1,000,000.00 |

These Sub Limits of Liability are part of, and not in addition to, the applicable Limits of Liability set forth in the Named Insured and Limits of Liability Endorsement.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

"MARKET TIMING"/"LATE TRADING"/"SOFT DOLLAR"/"FEES"/
BREAKPOINT DISCOUNTS EXCLUSION ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

     First Named Insured:
     Policy Number:
     Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including no obligation to defend or pay "defense costs" or indemnify any insured, with respect to any claim or liability arising out of or related in any way to actual or alleged "market timing", "late trading", "soft dollar activities" or "fees", the failure to provide a discount on volume purchases of mutual funds (i.e., breakpoint discounts), or providing fictitious or collusive bids or the failure to disclosure any compensation as required by law, regulation or agreement with any regulatory body or court, or any other activity which is in violation of federal or state statues or regulations or any mutual fund or life insurance company's policies or procedures or in contravention of or in violation of the terms of any prospectus or other representation made to investors.

This exclusion applies regardless of the form, style or denomination of any such claim of "market timing", "late trading", "soft dollar activities" or "fees", and regardless of whether such claim is criminal, administrative or civil, including, without limitation, claims alleging breach of contract, failure to supervise, negligent supervision or negligence of any kind, controlling person liability, breach of fiduciary duty, personal profiting, criminal activity, market manipulation, violation of any law related to mutual funds or variable life insurance or variable annuities, misrepresentation, estoppel, repudiation of any commitment, the failure to monitor, detect, identify or remediate "market timing", "short-term trading" or "late trading" or any other theory of liability.

"Market timing" means the making of short term purchases or sales of mutual fund shares or the separate accounts or sub accounts of a life insurance company contrary to or in violation of the mutual fund's or life insurance company's prospectus or other representation to investors, or any policy, limitation, agreement or procedure of the mutual fund or life insurance company, or contrary to or in violation of any state or federal statute or regulation; and any conduct associated with any of the above, including, without limitation: (1) the waiver of redemption fees associated with "short-term trading"; (2) the failure to abide by written representations regarding the permissibility of "short-term trading" or the mutual fund's or life insurance company's efforts to monitor or prevent "short-term trading"; (3) the receipt of fees or any other form of compensation from certain investors in exchange for providing such investors with "short-term trading" privileges not available to other investors.

"Short-term trading" means the purchase or sale of shares of a mutual fund or the separate accounts or sub accounts of a life insurance company in a time period less than that provided in the mutual fund's or life insurance company's prospectus or other agreement or in violation of the policies, limitation, agreements or procedures of the mutual fund or life insurance company, or as required by federal or state law or regulation, including, without limitation, any "in-and-out" trading of mutual fund shares or the separate accounts or sub accounts of a life insurance company or any other trade of mutual fund shares or the separate accounts or sub accounts of a life insurance company designed to take advantage of the inefficiencies in the methods used by the mutual fund or life insurance company to price its shares or sub accounts.

"Late trading" means: (1) any transaction involving mutual fund shares or the separate account or sub accounts of a life insurance company (including, without limitation, the placement or confirmation or cancellation of trades or orders for, or the purchase or redemption of mutual fund shares by the mutual fund or an intermediary) made after the mutual fund's or separate account's or sub account's net asset value (as defined in Rule 2A-4 of the Investment Company Act of 1940, as amended, in the case of the mutual fund) for a particular date has been made, or should have been made, but which transaction is made at a price based upon said mutual fund's or account's net asset value for that date; or (2) any transaction defined as late trading by any federal or state statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund or life insurance company.

"Soft dollar activities", as used in this endorsement, means paying or providing or receiving or accepting fees, commissions, bonuses, gratuities, services or any other form of compensation or benefit in exchange for preferential treatment by or recommendation of or purchase of a particular "security" (including, without limitation, a mutual fund or particular class of mutual fund shares or a particular separate account or sub account of a life insurance company), including, without limitation: (1) the payment of higher commissions for directing "securities" trades to a "broker"-"dealer" in return for investment

"MARKET TIMING"/"LATE TRADING"/"SOFT DOLLAR"/"FEES"/
BREAKPOINT DISCOUNTS EXCLUSION ENDORSEMENT

Page 2

research, advice, subscriptions, professional development programs, computer hardware or software; or (2) "payment for shelf space" defined to be the payment of monetary or other forms of compensation or other benefits to "broker"-"dealers", "registered representatives", "registered investment advisers", "associated persons" or other solicitors in return for steering their "clients" to the purchase of particular "securities"; (3) "directed commissions" (sometimes referred to as "directed brokerage") defined to be when a mutual fund or life insurance company or "registered investment adviser" chooses a "broker"-"dealer" to execute its "securities" trades in consideration of the sales volume by the "broker"-"dealer" or its associated "registered investment advisers", "registered representatives" or "associated persons" of the mutual fund's shares or the life insurance company's variable products or other "securities".

"Fees" means fees or any other form of compensation, whether direct or indirect, charged by, or charged to, mutual funds for investment advisory, management, administrative, distribution or other services, including, without limitation, brokerage fees, commissions, sales loads and 12(b)-1 fees.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
    Authorized Representative

FNX-48 (12-07)

INVESTIGATION, SETTLEMENT AND DEFENSE ENDORSEMENT

The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy.

    First Named Insured:
    Policy Number:
    Effective Date of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, it is understood and agreed that SECTION II B. is amended to read as follows:

B.     INVESTIGATION, SETTLEMENT AND DEFENSE

We have the right and duty to defend, as part of and subject to the applicable Limit(s) of Liability hereunder, any "suit" brought against the insured because of a "wrongful act" to which this policy applies and which seeks "damages" which are payable under the terms of this policy, even if any of the allegations of the "suit" are groundless, false or fraudulent.  We will choose the lawyer to defend any such "suit."  If an arbitration proceeding is brought with respect to a "suit", we will be entitled to exercise all the insured's rights in the choice of arbitrators and the conduct of the proceedings.  Subject to the applicable Limit(s) of Liability, we will pay all "defense costs" which are in excess of the applicable "retention".

We may investigate any "written claim" or "suit" as we deem appropriate.

We have the right, with the First Named Insured's consent, to make any settlement of a "written claim" or "suit" as we deem expedient.  The First Named Insured must consent to a settlement of a "written claim" or "suit" which we recommend, and which is acceptable to the claimant(s) (a "settlement opportunity"), within 15 days of the date the First Named Insured is first made aware of the settlement opportunity.  In the event the First Named Insured fails or refuses to consent to the settlement within the 15 days, our liability for the "written claim" or "suit" shall not exceed the lesser of (1) the amount, in excess of the applicable "retention", for which we could have settled the "written claim" or "suit", including "defense costs" incurred by us, or with our written consent, up to the date of such failure or refusal to consent or (2) the actual amount for which the "written claim" or "suit" was settled thereafter in excess of the applicable "retention", including applicable "defense costs".

In the event the First Named Insured fails or refuses to consent to a settlement opportunity, we shall have the right, but not the duty, to continue the defense of the "written claim" or "suit" thereafter.  If we continue the defense of the "written claim" or "suit", we may, at any time thereafter, withdraw from the further defense of said "written claim" or "suit" by tendering control of the defense to the First Named Insured.

In all events, our duty to defend any "suit", or to pay any settlement or judgment or "defense costs" relating thereto, ends after we have paid our applicable Limit(s) of Liability as set forth in SECTION V.  The Limits of Liability set forth in SECTION V include all payments for "defense costs" incurred by us, or incurred by the insured with our written consent, in excess of the applicable "retention" and within the applicable Limits(s) of Liability.  All "defense costs" which are in excess of the applicable "retention" shall first be subtracted from the applicable Limit(s) of Liability with the remainder, if any, being the amount available to pay "damages".  If the applicable Limit(s) of Liability is/are exhausted by the payment of settlements, judgments, awards and/or "defense costs" prior to the reduction of any pending "suit" against an insured to settlement, final judgment or award, we shall have the right to withdraw from any further defense thereof by tendering control of the defense of said "suit" to the First Named Insured.

The insured(s) shall not admit liability for or settle any "written claim" or "suit" or incur any "defense costs" without our prior written consent.  If we withdraw from the defense of a "written claim" or "suit" following the First Named Insured's failure or refusal to consent to a settlement, it will not be necessary for us to consent to any settlement or "defense costs" incurred thereafter.  However, our liability with respect to any such "written claim" or "suit" shall be limited as aforesaid.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-m37 (11-07)

DISCIPLINARY & SUBPOENA ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

      First Named Insured:
      Policy Number:
      Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and subject to the "Retention" and Aggregate Sub Limit of Liability set forth below, it is understood and agreed that the following coverage is provided under this policy to named insureds:

1. We shall, at the request of the named insured, retain counsel and pay said counsel's reasonable and necessary fees and associated costs to represent the insured: (1) with respect to "disciplinary proceedings" arising out of acts committed in rendering or failing to render "financial services", of a type otherwise covered by this policy for the named insured as set forth for the named insured in the Named Insureds Endorsement, on or after the named insured's applicable "retroactive date" for a "client" of the named insured, provided the "disciplinary proceeding" is both initiated against the named insured and reported to us in writing during the named insured's "policy period" or "extended reporting period" if applicable; and (2) with respect to advice with respect to the production of documents and/or to represent the named insured during the preparation for and giving of testimony in response to a Subpoena or Subpoena Duces Tecum that is both served on the named insured and reported to us during the named insured's "policy period" or "extended reporting period" if applicable .

2. The coverage provided by this endorsement for a named insured is subject to the Policy Aggregate Sub Limit of Liability set forth below which is the maximum amount payable under this endorsement for or on behalf of a named insured regardless of the number of "disciplinary proceedings" initiated or the number of subpoenas served on the named insured. The Policy Aggregate Sub Limit of Liability shall be part of, and not in addition to, the named insured's applicable Policy Limit of Liability set forth in the Limits of Liability Endorsement.

3. The "retention" applying to the coverage provided by this endorsement is $2,500.00 Each "Disciplinary Proceeding", Subpoena or Subpoena DucesTecum. The Policy Aggregate Sub Limit of Liability payable under this endorsement is $20,000.00 which is part of, and not in addition to, the named insured's applicable Policy Aggregate Limits of Liability set forth in the Limits of Liability Endorsement.

4. The following definition applies to the coverage provided by this endorsement:

   "Disciplinary proceeding" means a proceeding brought by a governmental authority or self-regulatory body to investigate actual or alleged misconduct committed by a named insured in providing "professional services" of a type otherwise covered for the named insured by this policy as set forth in the Named Insureds Endorsement."

5. The "retroactive date" for the coverage provided by this endorsement is the insured's date of continuous coverage provided under this policy, or predecessor policies, insuring members of the Financial Services Professional Liability Risk Purchasing Group, Inc. This coverage shall not apply to "disciplinary proceedings" or Subpoenas or Subpoenas Duces Tecum arising out of acts committed or occurring prior to that "retroactive date".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
             Authorized Representative

FNX-m134 (10-14)

TROUBLED SECURITIES ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and not withstanding any other provision of this policy, it is understood and agreed that this policy does not apply to any claim arising out of or in any way related to "financial services" provided in connection with any "security" or other investment issued by or with respect to any "entity" (including, without limitation, a limited partnership, master limited partnership or real estate investment trust) or any organization affiliated in any way with any such "entity", which has, as the coverage effective date of the named insured on this policy, actually or allegedly:

1.  admitted in writing its inability to pay its debts, or, in the case of a limited partnership or REIT, ceased or significantly reduced the amount of its distributions due to its financial difficulties;

2.  made a general assignment for the benefit of creditors;

3.  been the subject of any proceeding seeking to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking appointment of a receiver, trustee or other similar official for it or for any substantial part of its property;

4.  engaged in any business reorganization (including, without limitation, any transfer of all or substantially all of its assets, a "roll up", "roll over" or incorporation);

5.  taken any corporate action to authorize any of the actions set forth above;

6.  been the subject of a class action lawsuit involving its "securities";

7.  been under federal or state regulatory investigation with respect to its "securities"; or

8.  been the subject of complaints or "suits" by "clients" of the First Named Insured or its "registered representatives".

Claims referred to above shall include, without limitation, any claim alleging the violation of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, or any similar federal or state law, or any common law relating thereto, as well as claims relating to any entities listed below.

Claims arising out of or in any way related to:  Walker "Tony" Young, Acorn Capital Management; or Clelia Flores, Maximum Return Investments Inc.; or Shawn Merriman, Market Street Advisors; or Weizhen Tang; or Edward Stein, Gemini Fund 1 L.P., DISP LLC.; or DBSI products or services; or Bernard Madoff, or Bernard Madoff Investment Services LLC whether directly or via fund of fund originators such as Fairfield Greenwich Advisors; Tremont Capital Management; or Maxam Capital Management; or Robert A. Stanford, Stanford International Bank, Stanford Group Company and Stanford Capital; or Marc Drier, James Nicolson, or Mark Bloom, North Hills Fund; or Paul Greenwood, Stephen Walsh, WG Trading Company, WG Trading Investors Co., Westridge Capital Management, Inc.; or Provident Royalties, Provident Asset Management, LLC, Provident Energy 1, L.P., Provident Resources 1, L.P., Provident Energy 3, L.P. or Provident Operating Company, LLC; Shale Royalties, Inc., Shale Royalties, Inc. LLC or Shale Royalties 3-22; Medical Capital Corporation, Medical Capital Holdings, Inc., Medical Provider Funding Corporation VI or Medical Cap Note Programs; or Black Diamond Programs; or Desert Capital REIT; or Bruce Friedman, Diversified Lending Group, Inc. and Applied Equities, Inc.; or Landmark Capital Partners, LLC; or Bambi Holzer; LandAmerica Financial Group, Inc.; Tomas Petters, Petters Worldwide Group; Edward Oku; Lara Coleman; Ricardo Bonilla; Rojas and Shadai Yire; Paul Burks and Rex Venture Group; Jim Donnan and Gregory Crabtree; Bridge Premium Finance; Mark Feathers; Wayne Pamer; Gurudeo Persaud; John Geringer; George Levin and Frank Preve; David Conolly; Shervin Neman; Ephren Taylor II; Wendell Jacobson and Allen Jacobson; Garfield M. Taylor;

TROUBLED SECURITIES ENDORSEMENT

Page 2

Arrowhead Capital Management, LLC; Eric Aronson; Doris E. Nelson; James David Risher and Daniel Joseph Sebastian; Jeffrey A. Lowrance; David Ronald Allen; AIC, Inc.; James Clements and Zeina Smidi; John Scott Clark; Michael Watson and Joshua Escobedo; St. Anselm Exploration Co.; Fair Finance Company; Jason Bo and Alan Beckman; Francisco Illarramendi; Richard Dalton; Joseph Paul Zada; David Harrold and Bruce Prevost; Robert Anderson; Robert Stinson, Jr.; Daniel Spitzer; Trade-LLC; Matthew Jennings; Chimay Capital Management, Inc.; Merendon Mining, Inc.; Matthew Gagnon; Nevin Shapiro; McGinn Smith & Co.; Douglas Vaughan; Canopy Financial; Trevor Cook; Mantria Corporation; United Development Funding; or Puerto Rican bonds; Robert H. Shapiro and Woodbridge Group of Companies, LLC (including but not limited to: dba Woodbridge Wealth, RS Protection Trust, WMF Management, LLC, Woodbridge Structured Funding, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC Woodbridge Mortgage Investment Fund 3, LLC Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, Woodbridge Commercial Bridge Loan Fund 2, LLC, 144 Woodbridge-Affiliated Property Limited Liability Companies, 131 Woodbridge-Affiliated Holding Limited Liability Companies, Jeri Shapiro; Woodbridge Realty of Colorado, LLC dba Woodbridge Realty Unlimited; Woodbridge Luxury Homes of California, Inc. dba Mercer Vine, Inc.; Riverdale Funding, LLC; Schwartz Media Buying Company, LLC; WFS Holding Co., LLC); Future Income Payments LLC, LumpSum Pension Advance, Pension Funding LLC, Pensions Annuities & Settlements LLC, Pension Income LLC, Cash Flow Investment Partners, DFR Pension Funding, Veterans Benefit Leverage, Voyager Financial Group LLC (Pension4Case/Cash Out My Pension/Buy Your Pension), First American Finance Corporation, and Investing Forward (Termbrokers LLC); Kevin Merrill, Jay Ledford and Cameron Jezierski, along with their entities, Global Credit Recovery LLC, Delmarva Capital LLC, Rhino Capital Holdings LLC, Rhino Capital Group LLC, DeVille Asset Management Ltd. and Riverwalk Financial Corp.; 1 Global Capital LLC (aka 1st Global Capital and 1st Global Capital Financial Services), 1 West Capital LLC (aka 1st West Capital), Carl Ruderman and Steven A. Schwartz; GPB Capital Holdings (including but not limited to the following private placements GPB Holdings, GPB Holdings II, GPB Holdings III, GPB Automobile Portfolio, GPB Cold Storage, GPB Holdings Qualified, GPB Waste Management, and GPB NYC Development) and Ascendant Alternative Strategies; or any of their parents or "affiliates".

Claims arising out of or in any way related to Auction Rate Securities (ARS).

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of this policy, other than as stated above.

By: _____
Authorized Representative

NAMED INSUREDS ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and not withstanding any other provisions of this policy, it is understood and agreed as follows:

1. The member of the National Association of Professional Agents and the Financial Services Professional Liability Purchasing Group listed on the Master Policy Named Insureds Endorsement and the member's Master Policy Certificate of Insurance, who, prior to the later of his/her Coverage Inception Date indicated on said Certificate of Insurance or the date he/she signed his/her Application For Insurance under this Program, and as a condition precedent to any coverage under this policy, including any obligation to indemnify, defend or pay "defense costs", except as otherwise approved by us, (1) had never had any claim, suit or arbitration against him/her/it for any alleged malpractice, error, omission, mistake or other wrongful act within the last ten years, (2) after reviewing his/her/its records, had no knowledge or information of any fact situation, allegation or incident that might result in a complaint, claim, suit or arbitration against him/her/it, (3) was not aware of or involved in any fee dispute with a "client", (4) had never had his/her/its professional license or registration denied, suspended, revoked, non-renewed, or restricted in any way, (5) had never been disciplined, fined or suspended by the SEC, FINRA, a state securities, corporation or insurance department or other regulatory authority, and was not under investigation by any of these authorities, (6) had never been formally accused of violating any professional association's code of ethics or convicted of any felony or misdemeanor criminal offense, (7) had never had any contract or appointment with any insurance company, "broker"-"dealer" or other organization suspended, terminated, non-renewed or restricted for cause, and (8) had never had any application for any professional liability insurance policy or fidelity bond requested to be withdrawn, or declined, or had any such policy or bond canceled, issued on restrictive terms, or refused renewal, is a named insured under this policy, as of the later of his/he/its Coverage Inception Date, or the effective date of this policy, and prior to the end of his/her/its "policy period" as set forth below, for the Coverage Option(s) and Limits of Liability Option(s) specified below opposite his/her/its name and for which he/she/it is eligible in accordance with the terms of any such Coverage Option with respect to covered "wrongful acts" occurring on or after his/her/its "retroactive date", and prior to the end of his/her/its "policy period".  A named insured's "policy period" shall commence as of the later of his/he/its Coverage Inception Date, or the effective date of this policy and terminate one year later unless sooner terminated pursuant to the cancellation provisions of this policy or as set forth below.

2. Except as provided below in the case of a "new insured", a named insured's "retroactive date" shall be the first date that he/she/it has been continuously insured, up to his/her/its Coverage Inception Date set forth below, for professional liability coverage (errors and omissions coverage) for the type(s) of coverage provided to said insured by this policy.  For example, if this policy provides coverage for an insured's acts both as a "life insurance agent" and Series 6 "registered representative" and the insured has had professional liability insurance coverage for his acts a "life insurance agent" continuously since September 1, 1991, but only since June 1, 1996 for his acts as a Series 6 "registered representative", that insured would have the following "retroactive dates" under this policy: (1) September 1, 1991 for coverage for "wrongful acts" committed as a "life insurance agent"; and (2) June 1, 1996 for coverage for "wrongful acts" committed as a Series 6 "registered representative".  If an insured seeks coverage under this policy for a "wrongful act" committed prior to his/her/its Coverage Inception Date, he/she/it will have to provide evidence, satisfactory to us, of continuous professional liability insurance coverage for that type of "wrongful act", dating back at least to the date of that "wrongful act", in order for there to be any coverage for "damages", defense or "defense costs", under this policy for the insured for that "wrongful act".

The "retroactive date" for a "new insured" will be the later of one year prior to the date of that insured's Application for Insurance under this Program or that insured's first date of continuous professional liability coverage for the types of coverage applying to that insured under this policy.  For example, if this policy provides coverage for a "new insured's" acts both as a "life insurance agent" and Series 6 "registered representative" and the insured has had professional liability insurance coverage for his acts a "life insurance agent" continuously for a year prior to his/her Coverage Inception Date but only since his/her Coverage Inception Date for his acts as a Series 6 "registered representative", that

NAMED INSUREDS ENDORSEMENT

Page 2

insured would have the following "retroactive dates" under this policy: one year prior to his/her Coverage Inception Date for coverage for "wrongful acts" committed as a "life insurance agent"; and (2) his/her Coverage Inception Date for coverage for "wrongful acts" committed as a Series 6 "registered representative". If an insured seeks coverage under this policy for a "wrongful act" committed prior to his/her Coverage Inception Date, he/she will have to provide evidence, satisfactory to us, of continuous professional liability insurance coverage for that type of "wrongful act", dating back at least to the date of that "wrongful act", in order for there to be any coverage for "damages", defense or "defense costs", under this policy for the insured for that "wrongful act".

3.  In case of cancellation of coverage by a named insured or by his/her/its premium finance company, return premium shall be computed on the usual short rate basis subject to a minimum earned premium of one month of coverage for that insured. Earned premium, dues, administrative fees and any applicable taxes will not be returned to the insured. Any return premium shall be remitted to the insured via the Administrator for this Program.

4.  The following amended or additional definitions apply to the coverage afforded under this policy:

"Life insurance agent" means an "individual" or "entity" who/which is properly licensed by applicable regulatory authorities to act as an agent, broker, solicitor or consultant with respect to the sale of, or advice with respect to, the life, health, disability and accident insurance and annuity products for which he / she / it has coverage under this policy and which products, if required to be authorized or approved for sale by applicable regulatory authorities in the state of any such sale or advice, have been so authorized or approved. "Life insurance agent" does not include anyone while acting as a general agent or in any similar capacity for a life insurance company if he / she / it has or supervises any "life insurance agent" sub agents.

"Property and casualty insurance agent" means an "individual" or "entity" who/which is properly licensed by applicable regulatory authorities to act as an agent, broker, solicitor or consultant with respect to the sale of, or provision of advice with respect to, the property and casualty insurance products for which said "individual" or "entity" has coverage under this policy and which products, if required to be authorized or approved for sale by applicable regulatory authorities in the state of any such sale or advice, have been so authorized or approved. "Property and casualty insurance agent" does not include an "individual" or "entity" who/which is acting as a managing general agent or in any similar capacity for an insurance company including, without limitation, providing services with respect to underwriting of policies and settling of claims.

"Total commission and fee income" means a named insured "individual's" or agency's total commission and fee income from all "professional financial services" provided by that "individual" or agency for which coverage is sought by the "individual" or agency under this policy. For example, if an "individual" only seeks coverage under this policy for acts as a "life insurance agent" but also acts as real estate agent, only his/her commission and fee income from acts as a "life insurance agent" would be counted toward his "total commission and fee income" for purposes of coverage under this policy.

"New insured" means an "individual" named insured who (1) first received his/her "life insurance agent" and, if applicable, "property & casualty insurance agent" license(s) within two years of applying for insurance coverage under this Program, and (2) who has earned less than $100,000.00 in "total commission and fee income" for the one year period immediately preceding his/her Application for Insurance under this Program. An "individual" who had been licensed for more than two years prior to the date of his/her Application for Insurance under this Program as either a "life insurance agent" or a "property & casualty insurance agent", or who had "total commission and fee income" of $100,000.00 or more during the one year period immediately preceding his/her Application for Insurance under this Program is not a "new insured" and does not qualify for coverage as a "new insured".

5.  **Insured Types**. The number listed opposite a named insured's named below indicates that the named insured is one of the following:

"1" Means a "new insured".

**"1A"** means a "new insured" with a majority of "total commission and fee income" from "life insurance agent" / annuity / Series 6 "registered representative" activities.

**"1B"** means a "new insured" with some "total commission and fee income" from "property & casualty agent" activities.

NAMED INSUREDS ENDORSEMENT

Page 3

"2" Means an "individual" named insured (other than a "new insured") with a majority of "total commission and fee income" from "life insurance agent", annuity and Series 6 "registered representative" activities.

"2A"   means an "individual" named insured with "total commission and fee income" of $0 to $250,000.
"2B"   means an "individual" named insured with "total commission and fee income" of $250,001 to $500,000.

"3" Means an "individual" named insured (other than a "new insured") with some "total commission and fee income" from "property & casualty insurance agent" activities.

"3A"   means an "individual" named insured with "total commission and fee income" of $0 to $250,000.
"3B"   means an "individual" named insured with "total commission and fee income" of $250,001 to $500,000.

"4" Means an agency named insured with a majority of "total commission and fee income" from "life insurance agent", annuity and Series 6 "registered representative" activities.

"4A"   means an "agency" named insured with "total commission and fee income" of $0 to $250,000.
"4B"   means an "agency" named insured with "total commission and fee income" of $250,001 to $500,000.

"5" Means an agency named insured with a majority of "total commission and fee income" from "property & casualty insurance agent" activities.

"5A"   means an "agency" named insured with "total commission and fee income" of $0 to $250,000.
"5B"   means an "agency" named insured with "total commission and fee income" of $250,001 to $500,000.

6. **Coverage Options:**   The letter(s) listed opposite a named insured's name in the Coverage Option column below indicate that the following Coverage Option(s) apply to that insured:

**Option "A" - Life Agent Coverage:**  Provides coverage for a named insured acting as a "life insurance agent" with respect to advice regarding, sale and servicing of fixed life (including indexed products), accident & health, long term care, and disability insurance products (including Medicare Advantage and Medicare Supplemental Insurance and coverage for acts as an appointed "life insurance agent" with respect to presentation and recommendation of health and/or dental coverage available under a State Health Insurance Exchange set up under the Affordable Care Act).  Coverage is limited to covered insurance products issued by properly licensed, admitted insurance carriers in states where such products have been authorized to be sold by applicable regulatory authorities.

**Option "B" - Life Agent / Annuity Coverage:**  Provides coverage for a named insured acting as a "life insurance agent" for advice with respect to, sale and servicing of fixed life (including indexed products), accident & health, long term care, and disability insurance (including Medicare advantage and Medicare supplemental insurance and coverage for acts as an appointed "life insurance agent" with respect to presentation and recommendation of health and/or dental coverage available under a State Health Insurance Exchange set up under the Affordable Care Act) plus fixed annuities (including indexed annuities).  Coverage is limited to covered insurance products issued by properly licensed, admitted insurance carriers in states where such products have been authorized to be sold by applicable regulatory authorities.

**Option "C" - Life Agent / Annuity / Series 6 "Registered Representative" Coverage:**  Indicates coverage for a named insured acting as a "life insurance agent" with respect to, sale and servicing of fixed and variable life (including indexed products), accident & health, long term care, and disability insurance (including Medicare advantage and Medicare supplemental insurance and coverage for acts as an appointed "life insurance agent" with respect to presentation and recommendation of health and/or dental coverage available under the Affordable Care Act), fixed and variable annuities (including indexed annuities) as well as acting as a Series 6 "registered representative" selling variable products, mutual funds and unit investment trusts.

**Option "D" - Personal Lines P & C Coverage:**  Provides coverage for a named insured's activities as a properly licensed "property and casualty insurance agent" with respect to advice, sale and servicing of the following personal lines insurance products:  homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood insurance with respect to property and casualty insurance risks written through admitted insurance carriers and involving risks located within the "policy territory"; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply:

NAMED INSUREDS ENDORSEMENT

Page 4

(1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the named insured must have complied with his/her/its state's statutory and regulatory requirements involving flood insurance.  See the Limited Personal Lines Property and Casualty Agent Coverage Endorsement for full particulars and exclusions to coverage.

**Option "D-1" - Personal Lines P & C Coverage:**  Provides coverage, as more fully set out in the Limited Personal Lines Property and Casualty Agent Coverage Endorsement, for the named insured's activities as a properly licensed "property and casualty insurance agent" with respect to advice, sale and servicing of the following personal lines insurance products only:  homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood insurance with respect to property and casualty insurance risks written through admitted insurance carriers and involving risks located within the "policy territory"; provided, for coverage to apply with respect to claims arising out of or related in any way to residential flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the named insured must have complied with his/her/its state's statutory and regulatory requirements involving flood insurance.  See the Limited Personal Lines Property and Casualty Agent Coverage Endorsement for full particulars and exclusions to coverage.

**Option "D-2" - Personal Lines P & C Coverage:**  Provides coverage for the named insured's activities as a properly licensed "property and casualty insurance agent" with respect to advice, sale and servicing of the following personal lines insurance products only:  homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood insurance with respect to property and casualty insurance risks written through admitted insurance carriers and involving risks located within the "policy territory"; provided, for coverage to apply with respects to claims arising out of or related in any way to residential flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the named insured must have complied with his/her/its state's statutory and regulatory requirements involving flood insurance.  See the Limited Personal Lines Property and Casualty Agent Coverage Endorsement for full particulars and exclusions to coverage.

**Option "E" - Personal and Commercial Lines P & C Coverage:**  Provides Coverage for the named insured's activities as a properly licensed "property and casualty insurance agent", providing advice on, sale and servicing of the personal and commercial lines insurance products listed below, with respect to property and casualty insurance risks located within the "policy territory" and written through admitted insurance carriers:

Personal lines insurance coverage for the following insurance products only:  homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood; provided, for coverage to apply with respects to claims arising out of or related in any way to residential flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

Commercial lines insurance for the following insurance products only:  workers compensation and employers' liability, general liability, products liability, commercial multi-peril, business owner's policy, commercial automobile (does not apply to long haul trucking), commercial property and commercial flood; provided, for coverage to apply with respects to claims arising out of or related in any way to commercial flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

See the Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement for full particulars on coverage and exclusions to coverage.

NAMED INSUREDS ENDORSEMENT

Page 5

**Option "F" - Expanded Commercial Lines P & C Coverage:** Provides coverage for the named insured's activities as a properly licensed "property and casualty insurance agent" with respect to advice, sale and servicing of the following insurance products:

a. Commercial lines:  inland marine, medical malpractice and professional liability, directors and officers liability, employment practice liability, fidelity, surety, crop, hail, wind and earthquake insurance written through both admitted and non-admitted insurance carriers; provided, for coverage to apply with respects to claims arising out of or related in any way to earthquake insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving earthquake insurance.

Also covers the following commercial lines insurance products:  workers compensation and employers' liability, general liability, products liability, commercial multi-peril, business owner's policy, commercial automobile (other than long haul trucking which is not covered), commercial property and commercial flood through non-admitted insurance carriers; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

b. Personal lines:  homeowners, automobile, watercraft, recreational vehicle, motorcycle, personal umbrella, pet, renters, travel, and residential flood written through non-admitted insurance carriers; provided, for coverage to apply with respects to claims arising out of or related in any way to flood insurance, each of the following conditions precedent to coverage must apply: (1) such insurance must have been offered to the claimant; and (2) such offer must have been documented at the time of offer; and (3) if the offer was rejected, the rejection must have been documented in writing at the time of rejection; and (4) the agent must have complied with his/her state's statutory and regulatory requirements involving flood insurance.

c. Coverage under Option "F" is subject to the following Conditions Precedent to Coverage:

1. Any non-admitted insurance written by a named insured must be obtained through a licensed surplus lines broker who/which is not affiliated with that named insured or his/her employer.

2. No more than 10% of the named insured's revenue can be derived from the additional coverages provided by this Coverage Option as set forth in a., above.

If either of these Conditions Precedent to Coverage is not met, there will be no coverage under Option F.

d. See the Expanded Property and Casualty Agent Coverage Endorsement for full particulars on coverage and exclusions to coverage.

**"G" – "Healthcare Sharing Ministry" Coverage:**  Provides coverage for the named insured's activities for a properly licensed "individual" or agency also insured under coverage options "A", "B" or "C", with respect to advice on, sale and servicing of products offered by a "Healthcare Sharing Ministry" listed on the "Healthcare Sharing Ministry" Endorsement.  See the "Healthcare Sharing Ministry" Endorsement for full particulars, including the conditions precedent to coverage and exclusions for this coverage.

7. <u>Limits of Liability Options.</u>  Number(s) listed in the Limits of Liability Option(s) column listed below opposite a named insured's name indicate that the following Limits of Liability apply to that insured:

**Limits of Liability Option "1"**:  Indicates Limits of Liability of $1,000,000.00 Each "Wrongful Act" Aggregate / $1,000,000.00 Named Insured Aggregate; **provided, see the Limits of Liability Endorsement for Sub Limits of Liability applying to coverage for acts as a Property and Casualty Insurance Agent.**

**Limits of Liability Option "2"**:  Indicates Limits of Liability of $1,000,000.00 Each "Wrongful Act" Aggregate/ $2,000,000.00 Named Insured Aggregate; **provided, see the Limits of Liability Endorsement for Sub Limits of Liability applying to coverage for acts as a Property and Casualty Insurance Agent.**

**Limits of Liability Option "3"**:  Indicates Limits of Liability of $1,000,000.00 Each "Wrongful Act" Aggregate/ $3,000,000.00 Named Insured Aggregate; **provided, see the Limits of Liability Endorsement for Sub Limits of Liability applying to coverage for acts as a Property and Casualty Insurance Agent.**

**Limits of Liability Option "4"**:  Indicates Limits of Liability of $2,000,000.00 Each "Wrongful Act" Aggregate/ $2,000,000.00 Named Insured Aggregate; **provided, see the Limits of Liability Endorsement for Sub Limits of Liability applying to coverage for acts as a Property and Casualty Insurance Agent.**

NAMED INSUREDS ENDORSEMENT

Page 6

The Limits of Liability for P & C Coverage are shared with those provided to the named insured under that insured's chosen Coverage Option "A", "B" or "C". If the Limits of Liability chosen by a named insured for Coverage Option "A", "B" or "C" are higher than those chosen by that insured for P & C Coverage, the chosen P & C Coverage Option Limits of Liability will be Sub Limits of Liability of the named insured's coverage under Coverage Option "A", "B" or "C". If the Limits of Liability chosen by a named insured for Coverage Option "D" or "E" are higher than those chosen by that insured for Coverage Options "A", "B" or "C, the Limits of Liability for "A", "B" or "C" will be Sub Limits of Liability of the named insured's coverage under Coverage Option "D" or "E".

If there are any numbers in parenthesis (e.g., "6/1/16") under the Coverage Option(s) or Limits of Liability Option(s) for a named insured, they indicate the date on or after which a particular Coverage Option or increased Limits of Liability Option for that insured incepted; any such Coverage Option or increased Limits of Liability Option shall only apply to covered "wrongful acts" occurring on or after that date. Thus, for example, if the insured had Limits of Liability of $1,000,000 / $1,000,000 applying as of June 1, 2016, and thereafter on July 1, 2016 increased those limits to $1,000,000 / $3,000,000, the $1,000,000 / $1,000,000 Limits of Liability would still apply to "wrongful acts" occurring prior to July 1, 2016.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

## NAMED INSURED COMPANY ENDORSEMENT
(Only Applies To Insured Types 1A, 1B, 2A, 2B, 3A, and 3B)

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that each "entity" owned or controlled by an "individual" named insured or of which such an insured is an employee, is an additional insured under this policy, but only with respect to its vicarious liability arising out of "wrongful acts": (1) committed by said named insured, or by an "individual" who is not a "financial services professional" and who is acting under the personal direction and control of said named insured; (2) committed during the "coverage period" for said named insured; (3) for which a "written claim", naming said "entity" as a co-defendant with said named insured, is first presented to us during the "policy period" for said named insured; and (4) which "wrongful acts" are otherwise covered under the terms of this policy.

The "retention" and Limits of Liability applying to the coverage provided by this endorsement shall be part of, and not in addition to, the applicable "retention" and applicable Limits of Liability applying to said named insured under said "written claim".

The coverage provided by this endorsement does not apply to any named insured "entity" or to any of its employed or contracted named insured agents.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

RETENTION ENDORSEMENT

The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy.

      First Named Insured:
      Policy Number:
      Effective Date of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, it is understood and agreed that Item 7. Of the Declarations is amended to read as follows:

Item 7.

The "Retentions" applying to "written claims" covered by this policy are as follows:

(1) A. The Each "Wrongful Act" "Retention" applying with respect to covered "wrongful acts" arising solely in connection with the sale or servicing of fixed life, accident & health, disability and long term care insurance and annuities (other than indexed annuities) committed on and after the applicable "retroactive date" and prior to September 1, 2016 is $1,000.00.

B. The Each "Wrongful Act" "Retention" applying with respect to covered "wrongful acts" arising solely in connection with the sale or servicing of fixed life, accident & health, disability and long term care insurance and annuities committed on and after September 1, 2016 is $0.00.

(2) $2,500.00 Each Disciplinary Action, Subpoena or Subpoena Duces Tecum.

(3) $2,500.00 Each "Wrongful Act" for coverage under the Privacy & Identity Protection Endorsement.

(4) A. $5,000.00 Each "Wrongful Act" for covered "wrongful acts" arising out of or any way related to the sale or servicing of indexed annuities committed on and after the applicable "retroactive date" and prior to September 1, 2016 is $5,000.00.

B. The Each "Wrongful Act" "Retention" applying with respect to covered "wrongful acts" arising solely in connection with the sale or servicing of indexed annuities committed on and after September 1, 2016 is $0.00

(5) $5,000.00 Each "Wrongful Act" for covered "wrongful acts" arising out of or any way related to the sale or servicing of variable products; mutual funds or other "securities" which may be sold by a Series 6 "registered representative"; as well as covered personal lines property and casualty insurance other than residential flood.

(6) $10,000.00 Each "Wrongful Act" for covered "wrongful acts" arising out of or any way related to the sale or servicing of covered commercial lines property and casualty insurance other than commercial flood and earthquake and the expanded.

(7) $25,000.00 Each Claimant for covered "written claims" arising out of or in any way related to the coverage for sale or servicing of residential or commercial flood insurance and earthquake insurance under the coverage provided by the Limited Personal Lines Property and Casualty Agent Coverage Endorsement, Limited Personal and Commercial Lines Property and Casualty Agent Coverage Endorsement and the Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement combined.

RETENTION ENDORSEMENT

Page 2

(8) $25,000.00 Each "Written Claim" for all "written claims" arising out of or in any way related to the insurance products covered solely by the Expanded Commercial Lines Property and Casualty Agent Coverage Endorsement other than "written claims" arising out of or in any way related to the coverage for sale or servicing of residential or commercial flood insurance and earthquake insurance.

(9) If multiple products or covered "financial services" are involved in a "written claim", the "retention" that will apply is the highest applicable "retention" applying to those products or services.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                Authorized Representative

PRIVACY AND IDENTITY PROTECTION ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and subject of the Retention and Sub Limits of Liability set forth below, it is understood and agreed as follows:

1. This policy provides coverage for a named insured's legal liability for indemnity and "defense costs" arising out of "written claims" first reported to us during the named insured's "policy period" arising out of the negligent violation of a right of privacy or a "privacy regulation" by the named insured in the performance of "financial services" covered by this policy and resulting from:

   a. the loss or theft of "personal information" or data about a "client" which is in the named insured's care, custody or control including, without limitation, loss or theft from any computer, computer system, network or website that is in the insured's care, custody or control;

   b. the named insured's failure to prevent unauthorized access to "personal information" that has been provided to the named insured by a "client" or a "client's" representative;

   c. this endorsement does not apply to "written claims" arising out of or alleging "publication injury".

2. The following additional definitions apply to the coverage provided by this endorsement:

   "Personal information" means an "individual's":

   a. social security number;

   b. medical or healthcare data, or other protected health information;

   c. drivers license number or state identification number;

   d. account number, credit card number or debit card number in combination with any required security code, access code or password that would permit access to that individual's financial account; or

   e. other nonpublic "personal information" as defined in a "privacy regulation".

   "Privacy regulation" means state and federal identity theft and privacy protection legislation, statutes and regulations (including, without limitation, the Health Insurance Portability and Accountability Act, as amended, and the Gramm-Leach-Bliley Act, as amended) associated with the control or use of personally identifiable financial or other sensitive information that requires commercial "entities" that collect "personal information" to post privacy policies, adopt specific privacy controls, or notify "individuals" in the event that "personal information" has potentially been compromised.

3. The following "Retention" applies to the coverage provided by this endorsement:  $2,500.00 Each "Wrongful Act"

4. The following Sub Limits of Liability apply to the coverage provided by this endorsement:

   Each Named Insured Legal Liability Aggregate:  up to a total of $10,000.00, subject to the Policy Aggregate set forth below, to reimburse a named insured for legal liability arising out of "written claims" covered by this endorsement.

   Each Named Insured "Defense Costs" Aggregate:  up to a total of $10,000.00, subject to the Policy Aggregate set forth below, to reimburse a named insured for "defense costs" incurred in defending "written claims" covered by this endorsement.

   Each Named Insured Policy Aggregate:  $25,000.00 for all "written claims" covered by this endorsement.

   These Sub Limits of Liability are part of, and not in addition to, the Limits of Liability set forth in the Limits of Liability Endorsement.

5. The "Retroactive Date" applying to the coverage provided by this endorsement is the later of March 1, 2015 or the named insured's date of continuous coverage provided under this policy, or predecessor policies, insuring members of the Financial Services Professional Liability Risk Purchasing Group.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                   Authorized Representative

FNX-m131 (7-12)

CLAIMS EXCLUSION ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including, without limitation, no obligation to pay "damages", defend or pay "defense costs", for any "written claim" actually or allegedly arising out of or related in any way, directly or indirectly, to any of the following:

1.  the same or similar circumstances, acts, errors, or omissions as any complaint, claim, or "suit" against an insured, or an "affiliate" of an insured, or his/her company, its parents, subsidiaries or "affiliates", or his/her /its insurance company or "broker"-"dealer", or other litigation, whether or not identified in the "Application" or any attachments or supplements thereto, which occurred or was pending prior to the effective date of this policy, including, without limitation, the purchase, sale or advice regarding the same "security" or other investment product involved in that complaint, claim, or "suit";

2.  any incident or fact situation which occurred prior to the effective date of this policy, which is known to an insured, and which may reasonably be expected to result in a claim or "suit" against an insured;

3.  the purchase, sale or advice with regard to "securities" known to be in financial trouble prior to the effective date of this policy;

4.  those matters excluded from coverage in Section VI or elsewhere in the policy; or

5.  related to, or involving in any way, the "entities", "individuals", acts, activities, claims, claimants, or "securities", if any, listed below, including, without limitation, claims by or involving any such "entities", "individuals", acts, activities, claims, claimants or "securities", or arising out of the same or similar circumstances, acts, errors or omissions as said claims or claimants:

    Claims arising out of or in any way related to:  Walker "Tony" Young, Acorn Capital Management; or Clelia Flores, Maximum Return Investments Inc.; or Shawn Merriman, Market Street Advisors; or Weizhen Tang; or Edward Stein, Gemini Fund 1 L.P., DISP LLC.; or DBSI products or services; or Bernard Madoff, or Bernard Madoff Investment Services LLC whether directly or via fund of fund originators such as Fairfield Greenwich Advisors; Tremont Capital Management; or Maxam Capital Management; or Robert A. Stanford, Stanford International Bank, Stanford Group Company and Stanford Capital; or Marc Drier, James Nicolson, or Mark Bloom, North Hills Fund; or Paul Greenwood, Stephen Walsh, WG Trading Company, WG Trading Investors Co., Westridge Capital Management, Inc.; or Provident Royalties, Provident Asset Management, LLC, Provident Energy 1, L.P., Provident Resources 1, L.P., Provident Energy 3, L.P. or Provident Operating Company, LLC; Shale Royalties, Inc., Shale Royalties, Inc. LLC or Shale Royalties 3-22; Medical Capital Corporation, Medical Capital Holdings, Inc., Medical Provider Funding Corporation VI or Medical Cap Note Programs; or Black Diamond Programs; or Desert Capital REIT; or Bruce Friedman, Diversified Lending Group, Inc. and Applied Equities, Inc.; or Landmark Capital Partners, LLC; or Bambi Holzer; LandAmerica Financial Group, Inc.; Tomas Petters, Petters Worldwide Group; Edward Oku; Lara Coleman; Ricardo Bonilla; Rojas and Shadai Yire; Paul Burks and Rex Venture Group; Jim Donnan and Gregory Crabtree; Bridge Premium Finance; Mark Feathers; Wayne Pamer; Gurudeo Persaud; John Geringer; George Levin and Frank Preve; David Conolly; Shervin Neman; Ephren Taylor II; Wendell Jacobson and Allen Jacobson; Garfield M. Taylor; Arrowhead Capital Management, LLC; Eric Aronson; Doris E. Nelson; James David Risher and Daniel Joseph Sebastian; Jeffrey A. Lowrance; David Ronald Allen; AIC, Inc.; James Clements and Zeina Smidi; John Scott Clark; Michael Watson and Joshua Escobedo; St. Anselm Exploration Co.; Fair Finance Company; Jason Bo and Alan Beckman; Francisco Illarramendi; Richard Dalton; Joseph Paul Zada; David Harrold and Bruce Prevost; Robert Anderson; Robert Stinson, Jr.; Daniel Spitzer; Trade-LLC; Matthew Jennings; Chimay Capital Management, Inc.; Merendon Mining, Inc.; Matthew Gagnon; Nevin Shapiro; McGinn Smith & Co.; Douglas Vaughan; Canopy Financial; Trevor Cook; Mantria Corporation; United Development Funding; or Puerto Rican bonds; or any of their parents or "affiliates".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By:  _____
                Authorized Representative

LIFE INSURANCE DEFINITION ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and not withstanding any other provision of this policy, it is understood and agreed as follows":

The definition of "life insurance agent"  in Section I – Definitions is deleted and replaced by the following:

"Life insurance agent" means an "individual" or "entity" who/which is licensed, as required by law, to sell life, health, disability and accident insurance and annuity   products and who / which is selling or providing advise with respect to such products which, if required to be authorized or approved for sale by a regulatory   authority, have been so authorized or approved; however, it does not include, without limitation, an independent marketing organization (IMO), a field marketing organization (FMO),a  national marketing organization (NMO), or any organization performing the functions typically done by these entities or  anyone while acting as a general agent or in any similar capacity   for a life insurance company if he/she has or supervises any sub agents.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UT-3g (3-92)

CHANGES—VIRGINIA

---

The following information, and signature by our authorized representative, is required only when this endorsement is issued subsequent to preparation of the policy.

       First Named Insured:
       Policy Number:
       Effective Date of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed as follows:

1.   SECTION VII—CONDITIONS is amended as follows:

   a.   Subsection C. Suits Against Us is amended by adding the following paragraph:

      If execution of a judgment against an insured is returned unsatisfied in an action brought to recover "damages" for a covered "wrongful act" committed during the insured's "coverage period," then an action may be maintained against us under the terms of this policy for the amount of the judgment not exceeding the available applicable Limit(s) of Liability shown on the Declarations or an applicable endorsement.

   b.   Subsection D. Disputes With Us/Arbitration is deleted in its entirety.

   c.   Subsection J. Cancellation is replaced in its entirety by the following:

      J.   Cancellation

         1.   The First Named Insured may cancel this policy entirely, or as to any insured under this policy, at any time by giving us written notice stating when, thereafter, the cancellation is to take effect.

         2.   We may cancel this policy at any time in its entirety, or as to any insured, by mailing or delivering to the First Named Insured written notice of cancellation, stating the reason for cancellation, at least:

            a.   fifteen (15) days before the effective date of cancellation if we cancel for non-payment of premium; or

            b.   forty-five (45) days before the effective date of cancellation if we cancel for any other reason.

         3.   We will send written notice by registered or certified mail or deliver written notice to the First Named Insured's last mailing address known to us.

         4.   Notice of cancellation will state the effective date of cancellation. The "policy period" for insured(s) affected by the cancellation will end on that date.

         5.   In case of cancellation by the First Named Insured, or by the insured's premium finance company, we will refund unearned premium on the usual short rate basis, subject to retention by us of the Minimum Policy Premium specified in the Declarations and less any sums due us under this policy.

            In case of cancellation by us, we will refund any unearned premium on a pro rata basis, subject to retention by us of the Minimum Policy Premium specified in the Declarations and less any sums due us under this policy.

            If we do not refund the unearned premium with the notice of cancellation, we will refund it within a reasonable time after the date cancellation is effective; but refund or tender of the unearned premium is not required to make a valid cancellation of this policy."

   d.   Subsection K. Extended Reporting Period is replaced in its entirety by the following:

      "K.  Extended Reporting Period

CHANGES—VIRGINIA

If we cancel or non-renew this policy in total or as to any named insured, or if any "qualifying change in coverage" occurs during the policy period or upon renewal, the First Named Insured has the right to have issued an endorsement providing a two year "extended reporting period" following the effective date of said "qualifying change in coverage," cancellation or non-renewal, during which an "individual" or "entity" who/which was an insured immediately prior to the effective date of said "qualifying change in coverage," cancellation or non-renewal may present to us "written claims" arising out of "wrongful acts" occurring during the "coverage period" for said insured and otherwise covered under the terms of this policy.

However, an "extended reporting period" will not apply to cancellation or non-renewal due to non-payment of premium, failure to comply with terms or conditions of the policy or fraud. In addition, any "extended reporting period" for previously existing coverage that is newly excluded will only apply to the newly excluded coverage.

During this "extended reporting period," any "written claim" presented to us by an insured resulting from a "wrongful act," or a series of continuous, repeated or "interrelated wrongful acts," for which a "written claim" had been presented to us under the terms of a predecessor policy issued by us or by an "affiliate" insurer of ours, of which this policy is a renewal or one of a series of continuous renewals or successor policies, will be treated as if it had been presented to us during the last day of coverage under that predecessor policy and will be covered by that predecessor policy, not this policy, subject to all the terms and conditions of that predecessor policy, including, without limitation, its appli-cable Limit(s) of Liability.

While this policy, or any policy which is a renewal of this policy or one of a series of continuous renewals of this policy, is in effect, we will continue to cover all remaining insureds, without the need to purchase an "extended reporting period endorsement," with respect to "written claims," otherwise covered under the terms of this policy or said renewal policy, as applicable, arising out of "wrongful acts" committed by a "representative" who has ceased to be associated with the First Named Insured; provided, this continuing coverage shall not apply in the case of a departed "financial services professional" as to whom we have canceled coverage or refused to renew coverage or who has been terminated for cause by the First Named Insured or any other insured. In the latter cases, it will be necessary for the First Named Insured to buy an "extended reporting period endorsement" covering that "financial services professional," as otherwise provided in this subsection, for there to be any continuing coverage for any insured with respect to "written claims" arising out of the "wrongful acts" of said "financial services professional."

If the First Named Insured purchases an "extended reporting period endorsement" following a "qualifying change in coverage," cancellation or non-renewal of this policy, we will also cover, pursuant to the terms of that endorsement, each "financial services professional" who was a named insured on this policy, as of such "qualifying change in coverage," cancellation or non-renewal, for "written claims" arising out of "financial services," otherwise covered under the terms of this policy, which were rendered during the "coverage period" for that "financial services professional."

To obtain an "extended reporting period endorsement," the First Named Insured must, within thirty (30) days of the effective date of such "qualifying change in coverage," cancellation or non-renewal, give us written notice requesting the issuance of such an endorsement and pay an additional premium for that endorsement as determined by our rules, rates, and regulations in effect at that time. If the First Named Insured fails to purchase an "extended reporting period endorsement" within that thirty (30) day period, there will be no further coverage under this policy with respect to any insured affected by said "qualifying change in coverage," cancellation or non-renewal, effective as of the effective date of such "qualifying change in coverage," cancellation or non-renewal. We have no obligation to offer an "extended reporting period endorsement" to anyone other than the First Named Insured. The insurance we provide during an "extended reporting period" will be excess over any other valid and collectible insurance available to the insured.

If an "extended reporting period endorsement" is in effect, we will provide Limit(s) of Liability with respect to any covered "written claim" first made against an insured and reported to us during the "extended

CHANGES—VIRGINIA

reporting period" equal to the applicable Limit(s) of Liability applying to that insured at the end of that insured's "policy period."

An "extended reporting period" will not extend any "policy period." All premium paid for an "extended reporting period endorsement" shall be fully earned by us upon issuance of the endorsement and will not be refunded.

If we do not offer to renew this policy at the same premium, Limits of Liability or "retention" as apply to this policy, this will not be considered a cancellation or non-renewal by us.

With respect to this Extended Reporting Period provision only, "qualifying change in coverage" means:

1.  The "retroactive date" is changed such that it is later than the date shown in the Declarations or an applicable endorsement;

2.  A "retroactive date" newly applies to coverage where none was previously shown in the Declarations or an applicable endorsement;

3.  This policy no longer applies to "wrongful acts" on a claims-made basis; or

4.  Previously existing coverage under this policy is newly excluded."

e.  Subsection L. Concealment, Misrepresentation Fraud or Material Change is amended by adding the following paragraph:

"We will not deny or rescind coverage under this policy, based on concealment or misrepresentation on an application, unless the concealment or misrepresentation was material to the risk that we assumed in issuing this policy and has proven untrue."

f.  The following Subsection is added:

"Q.  Non-renewal

1.  If we elect not to renew this policy, we will mail or deliver a notice of non-renewal to the First Named Insured at the address shown in the Declarations, stating the reason for non-renewal, at least:

a.  fifteen (15) days before the expiration date if the non-renewal is due to non-payment of premium; or

b.  forty-five (45) days before the expiration date if the non-renewal is for any other reason.

2.  We will send written notice by registered or certified mail or deliver written notice of non-renewal to the First Named Insured's last mailing address known to us."

2.  The following Subsection is added to SECTION VI—WHAT WE DO NOT COVER—EXCLUSIONS:

"W.  Revocation or Suspension of License. We do not cover claims which arise out of or are contributed to by a "wrongful act," committed by an insured on or after the effective date said insured's license, registration or other right to act as a "broker"-"dealer" or to provide "financial services" or practice as a "financial services professional" is non-renewed by the insured or is revoked or suspended by, or surrendered at the request of, any regulatory authority."

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FN-137-VA (10-19)

# National Casualty Company

## IMPORTANT INFORMATION REGARDING YOUR INSURANCE
## (VIRGINIA)

In the event you need to contact someone about this insurance for any reason, **please contact your agent.** If no agent was involved in the sale of this insurance, or if you have additional questions, you may contact the insurance company issuing this insurance at the following address and telephone number:

> National Casualty Company
> Property/Casualty Division
> 8877 North Gainey Center Drive
> Scottsdale, Arizona 85258-2109
> P.O. Box 4110, 85261-4110
> 1-800-423-7675

If you have been unable to contact or obtain satisfaction from the Company or the agent, you may contact the Virginia State Corporation Commission's Bureau of Insurance at:

> State Corporation Commission
> Bureau of Insurance
> Property and Casualty Division
> P.O. Box 1157
> Richmond, Virginia 23218
> In State: 1-800-552-7945
> Out of State: 1-804-371-9741 (Direct Line)

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, Company, or Bureau of Insurance, have your policy number available.

NOTN0056VA (5-16)

# National Casualty Company

## NOTICE TO THE INSURED—VIRGINIA

You have purchased a claims-made liability insurance policy. Please read the policy carefully to understand your coverage. There are certain circumstances in which you must be provided the opportunity to purchase extended reporting coverage. These are explained in your policy. If you have any questions, please contact your company or your agent.

NOTN0560VA (9-15)

**FINANCIAL SERVICES PROFESSIONAL LIABILITY INSURANCE POLICY**
Underwritten By The Insurance Company Shown In The Declarations

IMPORTANT NOTICE

THIS IS A "CLAIMS-MADE AND REPORTED" POLICY.  EXCEPT TO THE EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY COVERS ONLY "WRITTEN CLAIMS" FIRST MADE AGAINST THE INSURED AND PRESENTED TO US DURING THE "POLICY PERIOD" FOR THE INSURED ARISING FROM COVERED "WRONGFUL ACTS" OCCURRING SUBSEQUENT TO THE "RETROACTIVE DATE" APPLICABLE TO THE INSURED.  EACH "WRITTEN CLAIM" MUST BE MADE BY OR ON BEHALF OF A "CLIENT" OF A NAMED INSURED OR A "CLIENT" OF A "REPRESENTATIVE" NAMED ON THIS POLICY AND ARISE OUT OF OR IN CONNECTION WITH COVERED "FINANCIAL SERVICES" PERFORMED FOR SAID "CLIENT" BY A NAMED INSURED OR A NAMED "REPRESENTATIVE".  THIS POLICY INCLUDES "DEFENSE COSTS" IN THE LIMITS OF LIABILITY.  THE PAYMENT OF "DEFENSE COSTS" WILL REDUCE THE AMOUNTS AVAILABLE TO PAY "DAMAGES".  VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE AND THE AMOUNTS AVAILABLE TO PAY "WRITTEN CLAIMS", INCLUDING, WITHOUT LIMITATION, THE AGGREGATE LIMITS OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS AND DUTIES AND WHAT IS AND IS NOT COVERED.

In consideration of the payment of the premium and any other amounts due pursuant to the terms of this policy, in reliance upon the information, representations and warranties contained in the "Application", and subject to all of the terms and conditions of this policy, including, without limitation, the Limits of Liability and Exclusions of this policy, we agree to provide the insureds with the insurance coverage described in this policy.  In return, the First Named Insured agrees to pay the premium and any other amounts due pursuant to the terms of this policy, and each insured agrees:  (1) to perform each duty the insured has under this policy; and (2) that this policy contains all agreements relating to this insurance that exist between the insureds and us, our employees, agents and representatives.

SECTION I --- DEFINITIONS

Throughout this policy, certain words have special meanings.  The words "First Named Insured" mean the "individual" or "entity" specifically identified by name or reference as the First Named Insured in Item 1 of the Declarations or an endorsement.  The words "named insured" mean an "individual" or "entity" specifically identified by name or by reference as a named insured in the Declarations or an endorsement.  The word "insured" means any "individual" or "entity" qualifying as such under the provisions of SECTION IV.  The words "Limit of Liability" mean the applicable Limit of Liability as set forth in SECTION V or an endorsement.  The words "we", "us," and "our" mean the insurance company providing this insurance.  The word "policy" means the Declarations, this policy form, and any endorsements which are made a part hereof.  The word "endorsement" means a written agreement, issued by us at the time of issuance of this policy or thereafter, amending the wording or meaning of this policy.  An endorsement is the only means by which this policy may be altered or amended.

Other words and phrases that appear in quotation marks in this policy have the special meanings set forth below.

"Affiliate" of a specified "individual" or "entity" means an "individual" or "entity" that directly, or indirectly though one or more intermediaries, controls or is controlled by, or is under common control with, the specified "individual" or "entity"; it includes, without limitation, any "entity" of which an insured is an owner, officer, director, shareholder, partner, or member.

"Application" means the Application for Insurance or Renewal Application for Insurance submitted in connection with this policy, and any Applications for Insurance or Renewal Applications submitted in connection with any prior financial services insurance policy issued by us or by any "affiliate" insurer of ours, which this policy succeeds in time, including any materials and information submitted in connection therewith, which Application(s), material and information shall be on file with us and deemed a part of and attached hereto as if physically attached hereto.

"Associated person" has the same meaning as the term "affiliated person" or "person associated with an investment advisor" as those terms are defined in the Investment Company Act of 1940, the Investment Advisers Act of 1940, or any similar state statutes or regulations.

"Broker" has the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, and the Investment Company Act of 1940, as amended; but "broker" does not mean an "individual" who is a "registered representative".

"Client" means an "individual" or "entity" which is a member of the general public and which, as the direct or ultimate consumer, uses the "financial services" of a named insured "entity" or "representative".  It does not include, without limitation, any "individual" or "entity" who/which buys with the intent of selling to others or sells with the intent that the buyer sell to others or which provides services as part of a chain of services to the ultimate consumer.

"Coverage period" with respect to an insured under this policy means the period of time beginning with the applicable "retroactive date" for that insured, as stated in this policy, and ending with the expiration of that insured's "policy period".

"Damages" means a monetary judgment, award or settlement.  "Damages" do not include:  civil or criminal fines, sanctions or penalties imposed on any insured, whether imposed pursuant to statute or otherwise; punitive or exemplary damages, including double or treble damages or any damages in excess of actual damages; judgments or awards arising from acts or omissions deemed uninsurable by the law under which this policy shall be construed; or fees, commissions or other compensation for any "financial services" rendered or required to be rendered by an insured or by a "representative" or that portion of any settlement, judgment or award in an amount equal to such fees, commissions or other compensation.  However, "damages" shall include taxes, fines and penalties incurred by a "client" of a named insured or "representative" solely as a result of covered "wrongful acts" by a named insured or by a named "representative"  and included in such "client's" "written claim" against the insured.

©ProSurance Group, Inc. 2007

"Dealer" has the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, and the Investment Company Act of 1940, as amended; but "dealer" does not mean an "individual" who is a "registered representative".

"Defense costs" means the costs to investigate, defend or appeal a "written claim" or "suit" incurred by us or by an insured at our request and with our prior written consent.  It includes attorneys' fees, expert fees and all other costs and expenses related to the investigation, settlement, defense or appeal of a "written claim" or  "suit", including, without limitation, those payments set forth in SECTION II C. 1.; but it does not include loss of earnings, wages, salaries, overhead or benefit expense of the insured, or the insured's employees, officers or independent contractors, or our officers, directors or employees, or any hourly or fixed fees paid to a claims administrator we may use to administer claims under this policy in place of our officers or employees.  "Defense costs" do not include, and we will not pay, any fees or costs incurred by the insured without our prior written consent, including, without limitation, any fees and costs incurred prior to the date the "written claim", out of which such fees or costs arise, is first presented to us.

"Discretionary account agreement" means an agreement, actual or implied, under the terms of which an "individual" or "entity" has "investment discretion" in buying or selling or otherwise handling the "securities" or other investments of a third party; it does include, without limitation, a power of attorney, but it does not include:  (1) a "Limited Mutual Fund Market Timing/Asset Allocation Agreement;" or (2) any other "investment management contract" under the terms of which an insured "registered investment adviser" is given, or exclusively exercises, "investment discretion" only with respect to buying, selling or otherwise handling mutual fund investments and/or the investments in variable life or variable annuity sub accounts, which investments are otherwise covered under the terms of this policy, and where said insured does not retain custody or otherwise have access to any "client" funds other than for the limited purpose of paying fees earned pursuant to the explicit terms of that agreement.

 "Entity" means a partnership, corporation, limited liability company, trust, association or other form of business, social or charitable organization.

"Entity insured" means an insured which is not a natural person.

"Extended reporting period" means the period of time, following expiration of an insured's "policy period", which is specified in an "extended reporting period endorsement" and during which said insured may present "written claims" to us arising out of "wrongful acts" occurring during said insured's "coverage period" and which claims would otherwise have been covered under the terms of this policy if they had been presented to us during said insured's "policy period".  An "extended reporting period" shall be provided only by a separate endorsement issued by us pursuant to SECTION VII K.

"Extended reporting period endorsement" means an endorsement providing an "extended reporting period" pursuant to SECTION VII K.

"Financial planner" means anyone who is in the business of providing "financial planning services" to others.

"Financial planning services" means the provision of financial or investment advice to "individuals" or families or their owned business entities based upon an analysis of their individual needs, financial circumstances and objectives.  Generally, it includes preparing a financial plan, comprehensive or modular, which could include:  personal financial statements; and advice relating to personal risk management, insurance, savings and investments, estate planning, retirement planning and taxes.

"Financial services" means the provision of:  "financial planning services" by a "financial planner"; "investment management services" by a "registered investment adviser" or an "associated person" of a "registered investment adviser"; the purchase or sale of "securities" or the provision of "investment advice" by a "registered representative"; and the proposed sale or sale of products authorized to be sold by a properly licensed "life insurance agent", including, without limitation, life, health, disability and accident insurance products and annuities; provided, "financial services" does not include any advice with respect to or the sale of viatical products.

"Financial services professional" means any "individual" who is a "financial planner", "registered investment adviser", "associated person", "life insurance agent" and/or "registered representative".

"Individual" means a natural person.

"Interrelated wrongful acts" means "wrongful acts" which are connected by a common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.  For example, if an insured recommends or sells an unsuitable investment to a "client", any subsequent dealings with that "client" with respect to that investment would be part of a series of "interrelated wrongful acts", as would the claims against an insured under a class action "suit".

"Investment advice" means advice with respect to "securities" provided by a "registered representative" which is solely incidental to his/her conduct as a "registered representative" and for which he/she receives no special compensation, all pursuant to the provisions of the Investment Advisors Act of 1940, as amended.

"Investment discretion" means the making of one or more investment decisions (buy, sell or otherwise handle) by an "individual" or "entity" with respect to the assets, "securities" or other investments belonging to a third party without that third party's prior approval of each such decision.

"Investment management contract" means a written contract between a "registered investment adviser" and his/her/its "client", contained in a single document or a series of related documents, setting forth the "registered investment adviser's" duties and responsibilities with respect to the investment of the "client's" money; it includes, without limitation, a "Limited Mutual Fund Market Timing / Asset Allocation Agreement", but it does not include a "discretionary account agreement".

"Investment management services" means advising with respect to and/or supervising the purchase or sale of "securities" or other investments for a "client" by a "registered investment adviser" or "associated person" pursuant to an "investment management contract".

"Life insurance agent" means an "individual" or "entity" who/which is licensed, as required by law, to sell life, health, disability and accident insurance and annuity products and who / which is selling or providing advise with respect to such products which, if required to be authorized or approved for sale by a regulatory authority, have been so authorized or approved; however, it does not include, without limitation, anyone while acting as a general agent or in any similar capacity for a life insurance company if he/she has or supervises any sub agents.

"Limited Mutual Fund Market Timing / Asset Allocation Agreement" means an "investment management contract" (1) under the terms of which a "registered investment adviser" is given authority to shift the assets of his/her/its "clients" between various mutual funds and (2) where the "registered investment adviser" does not retain custody or otherwise have access to any "client" funds other than for the limited purpose of paying fees earned pursuant to the explicit terms of that agreement.

"Policy period" means the period of time between the inception date shown in the Declarations of this policy and the date this policy expires or is canceled, whichever occurs first; provided, in the case of a particular insured, "policy period" shall mean the period of time between the inception of coverage under this policy with respect to that insured and the date this policy expires, is canceled or coverage otherwise terminates with respect to that insured, whichever occurs first.  "Policy period" specifically excludes any "extended reporting period" provided under the terms of an "extended reporting period endorsement".

"Policy territory" means the United States, its territories or possessions, Puerto Rico or Canada.

"Private securities transaction" means the selling by a "registered representative" of "securities" or other investment products which are not on the approved product list of, or which are not otherwise authorized or approved for sale by, the "registered representative's" "broker"-"dealer".

"Publication injury" means injury, other than bodily injury, caused by oral or written publication of material by an insured as part of or in conjunction with the provision of covered "financial services" to a "client" of a named insured or "representative" that:  slanders or libels the "client" or disparages the "client's" goods, products, or services; or discloses, without authorization and in violation of an "individual's" right of privacy, confidential information obtained in conjunction with the provision of "financial services".

"Registered investment adviser" has the meaning assigned to that term by the Investment Advisers Act of 1940, as amended, or applicable state securities laws or regulations.

"Registered representative" means an "individual" who:  (1) is registered with the National Association of Securities Dealers, Inc. as a "registered representative" of a "broker"-"dealer" pursuant to the provisions of the Securities Exchange Act of 1934; and (2) is in the business of buying and selling "securities" for the account of others.  It does not include any "individual" while acting in the capacity of a principal of a "broker" or "dealer", including, without limitation, a General Securities Principal and Limited Principal - General Securities Sales Supervisor.

"Related individual" means an "individual" related by blood, or by marriage or civil union (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) to another "individual", including, without limitation, the "spouse" or former "spouse" of an insured, or the child, grandchild, parent, sibling, aunt, uncle, grandparent or cousin of an insured or an insured's "spouse" or former "spouse", and any trust or estate of which any of them is a beneficiary.  With respect to any "entity insured", "related individual" includes a "related individual" of each officer, director, shareholder, partner, member, employee or independent contractor of such "entity".

"Representative" means a "financial services professional" providing the type of "financial services" covered by this policy, as set forth in the Limitation of Coverage Endorsement, who is or was associated with the First Named Insured on or after the First Named Insured's "retroactive date" and who is named on this policy.

"Representative company" means an "entity" which is owned or controlled by, or which employs a "representative", and which is in the business of providing the type of "financial services" covered by this policy.

"Retention" means the sum of money that the insured agrees to maintain as self-insurance with respect to all "written claims" arising out of each "wrongful act" otherwise covered by this policy.  The applicable each "wrongful act" "retention" applies on a first dollar basis and up to its stated amount, to all sums incurred in the investigation, settlement and/or defense of all "written claims" arising out of a "wrongful act".  The Each "Wrongful Act" Aggregate Limit of Liability of this policy applies in excess of the "retention" which must be exhausted by the payment of indemnity and/or "defense costs" before we have any duty to pay indemnity or "defense costs".  The amount of the applicable "retention" is specified as the Each "Wrongful Act" "Retention" in the Declarations or an endorsement.

"Retroactive date" means the date on or after which insurance coverage is provided under this policy to a particular insured with respect to the insured's covered "wrongful acts" or the insured's liability for the covered "wrongful acts" of others.  The "retroactive date" applicable to a particular insured is as follows:  (1) with respect to an insured "financial services professional", the "retroactive date" specified as applying to said insured in the Declarations or the endorsement identifying him/her as a named insured; (2) with respect to the First Named Insured or any "entity" named insured, or any insured under SECTION IV C or D, the later of (a) the "retroactive date" specified in the Declarations or an endorsement as applying to said insured, or (b) the date the "individual" became a partner, member, officer, director or employee of the First Named Insured or other "entity" named insured, or (c) with respect "wrongful acts" arising out of or in conjunction with the provision of "financial services" by a particular "individual" named insured, the "retroactive date" specified in this policy as applying to that "individual"; (3) with respect to the "spouse" of a named insured, the later of the date he/she became the "spouse" of said named insured or the "retroactive date" of said named insured; (4) with respect to insureds under SECTION IV G, the "retroactive date" of the deceased, incompetent or bankrupt insured.  For example, the "retroactive date" for the First Named Insured with respect to its vicarious liability arising out of the "wrongful acts" of an named insured "financial services professional" would be the later of the "retroactive date" for the First Named Insured specified in the Declarations or an endorsement or the "retroactive date" of said "financial services professional".  There is no coverage under this policy with respect to any "wrongful act" or series of continuous, repeated or "interrelated wrongful acts", where

the "wrongful act" or the first "wrongful act" in a series of continuous, repeated or "interrelated wrongful acts", is committed prior to the applicable "retroactive date".

"Securities" has the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, or any applicable state statute, and any rules or regulations issued pursuant thereto.

"Spouse" means the lawful "spouse" of an "individual" whether such status is derived by reason of marriage, civil union or otherwise pursuant to the statutory law, common law or otherwise of any jurisdiction of the world.

"Suit" means a civil legal proceeding, including arbitration, brought against the insured seeking monetary "damages".  It does not include:  criminal legal proceedings; legal proceedings, or that part of legal proceeding, seeking equitable relief (including, without limitation, injunctions or specific performance); or legal proceedings brought by a governmental or regulatory entity including, without limitation, those seeking fines, penalties, taxes or suspension or revocation of license, registration, membership or other operating authority.

"Written claim" means a written notice or demand, including "suit", signed by or on behalf of a "client" of a named insured or a "representative" who is alleged to have suffered monetary loss as a result of or in conjunction with the provision of "financial services", by a named insured or "representative" and asserting that the insured is liable for said monetary loss.  A report made to us by an insured for any reason, including, without limitation, loss control or risk management purposes, shall not be considered a "written claim".

"Wrongful act" means any negligent breach of duty, error, misstatement, misrepresentation, omission, "publication injury", or other negligent act done or attempted by an insured, or by any "individual" for whose acts the insured is legally responsible, in conjunction with the provision of covered "financial services", as set forth in the Limitation of Coverage Endorsement, for the "client" of a named insured or "representative".  Any such "wrongful act", together with any related "wrongful acts" or series of continuous, repeated or "interrelated wrongful acts", shall be considered one "wrongful act" for purposes of the application of our Limits of Liability and the applicable "retention".  A "wrongful act" which is continuing in nature shall be deemed, for all purposes of this policy, to occur only on the date on which such "wrongful act" commences and not on any subsequent date.  A series of continuous, repeated or "interrelated wrongful acts" shall be deemed to have occurred on the date on which the earliest of such "wrongful acts" commences.  If a continuing "wrongful act" or a series of repeated or "interrelated wrongful acts" is committed by an insured, or by any "individual(s)" for whose acts such insured is legally responsible, prior to such insured's applicable "retroactive date", there shall be no coverage under this policy for any insured for any of those "wrongful acts" even if some of those acts occur during the "policy period".

SECTION II --- COVERAGE AGREEMENTS

A.  COVERAGE

We will pay on behalf of the insured all sums in excess of the "retention" which do not exceed the applicable Limit of Liability and which the insured shall become legally obligated to pay as "damages" because of a "wrongful act" to which this policy applies committed by the insured, or by any "individual" for whose acts the insured is legally responsible, but only if the "wrongful act", or the first in the series of continuous, repeated or "interrelated wrongful acts":

1.  arises solely out of or in connection with the provision of covered "financial services" for the "client" of a named insured or a "representative";
2.  occurs during the "coverage period" for both the insured and the "individual", if any, for whose acts the insured is legally responsible; and
3.  results in a "written claim" which is first made against the insured and presented to us during the insured's "policy period"; provided, in case of cancellation or non renewal of this policy with respect to an insured, if a "written claim" is first made against that insured during the last fifteen days of that insured's "policy period", that "written claim" may be presented to us no later than fifteen days immediately following the effective date of such cancellation or non renewal if, as a condition precedent to that right, that insured has not procured or does not have available to him/her/it other insurance which applies to said "written claim" or which would apply in the absence of this policy.

B.  INVESTIGATION, SETTLEMENT AND DEFENSE

We have the right and duty to defend, as part of and subject to the applicable Limit of Liability hereunder, any "suit" brought against the insured because of a "wrongful act" to which this policy applies and which seeks "damages" which are payable under the terms of this policy, even if any of the allegations of the "suit" are groundless, false or fraudulent.  We will choose the lawyer to defend any such "suit."  If an arbitration proceeding is brought with respect to a "suit", we will be entitled to exercise all the insured's rights in the choice of arbitrators and the conduct of the proceedings.  Subject to the applicable Limit of Liability, we will pay all "defense costs" which are in excess of the applicable "retention".

We may investigate and settle any "written claim" or "suit" as we deem appropriate.

Our duty to defend any "suit", or to pay any settlement or judgment or "defense costs" relating thereto, ends after we have paid our applicable Limit of Liability as set forth in SECTION V.  The Limits of Liability set forth SECTION V include all payments for "defense costs" incurred by us, or incurred by the insured with our written consent, which are in excess of the applicable "retention".  All "defense costs" shall first be subtracted from the applicable Limit of Liability with the remainder, if any, being the amount available to pay "damages".  If the applicable Limit of Liability is exhausted by the payment of settlements, judgments, awards and/or "defense costs" prior to the reduction of any pending "suit" against an insured to settlement, final judgment or award, we shall have the right to withdraw from any further defense thereof by tendering control of the defense of said "suit" to the insured.

C.  OTHER PAYMENTS

1.  With respect to such insurance as is afforded by this policy, we will pay, as part of the applicable Limit of Liability the following:

a.  all costs taxed against the insured in any "suit" defended by us and all interest required to be paid on the entire amount of any judgment therein which does not exceed the applicable Limit of Liability hereunder and which accrues after judgment is entered in said "suit" and before we have paid, or deposited in court, such part of such judgment as does not exceed the applicable Limit of Liability;

b.  premiums on bonds to release attachments in any such "suit" for an amount not in excess of the applicable Limit of Liability of this policy, but we shall have no obligation to apply for or furnish or provide collateral for any such bonds;

c.  premiums on appeals bonds which may be required, in our sole judgment, in any such "suit" defended by us, but we shall have no obligation to apply for or furnish or provide collateral for any such bonds; and

d.  reasonable expenses, other than loss of earnings, wages, salaries, overhead or benefit expense of the insured, or employees, officers or independent contractors of the insured, incurred by the insured at our request in assisting us in the investigation, settlement, defense or appeal of any "written claim" or "suit".

2.  With respect to such insurance as is afforded by this policy, we will pay, in addition to the applicable Limit of Liability, all costs and expenses incurred by us other than "defense costs".

## SECTION III --- APPLICATION OF POLICY

This policy applies to liability for "damages" caused by "wrongful acts" committed anywhere in the world provided any "suit" for such "damages" is brought within the "policy territory".  However, we may elect at any time, at our sole discretion, to investigate, settle or defend any "written claim" or "suit" brought anywhere outside the "policy territory".  A "written claim" is "presented to us" when we receive the "written claim" or a copy thereof.

If this policy applies to a "written claim" arising out of a "wrongful act" (the first "written claim"), an "individual" or "entity" which is an insured under both this policy and a renewal, or one of a series of continuous renewals, of this policy, may present to us, during his/her/its "policy period" under such renewal policy, additional "written claims" arising out of that same "wrongful act", or series of continuous, repeated or "interrelated wrongful acts".  Any such additional "written claims" will then be considered to have been presented to us under this policy as part of the first "written claim" and shall be covered by this policy subject to all of the terms and conditions of this policy, including, without limitation, the Limits of Liability and "retention".

## SECTION IV --- WHO IS INSURED UNDER THIS POLICY

Each of the following is an insured under this policy to the extent set forth below:

A.  The First Named Insured.

B.  Each "financial services professional" who is a named insured on this policy.

C.  If a named insured "entity" is a partnership, association, corporation or limited liability company, each of that insured's present, former and future partners, members, officers and directors, but each is covered only for his/her vicarious liability as a result of such status and arising out of the provision of covered "financial services" by a named insured or a "representative" named on this policy; provided, no such partner, member, officer or director is an insured under this policy with respect to liability arising out of or in conjunction with his/her own acts or omissions as a "financial services professional" unless he/she is a named insured on this policy.

D.  If a named insured is an "entity", each of that "entity's" present, former or future employees who is not a "financial services professional", but only while acting within the course and scope of his/her duties as an employee of the said insured in connection with the provision of covered "financial services" by a named insured or a "representative" named on this policy.

E.  Each other named insured.

F.  The "spouse" of a named insured, but solely with respect to his/her vicarious liability, arising out of his/her status as the "spouse" of said named insured, as a result of covered "wrongful acts" of said named insured, including, without limitation, "written claims" seeking "damages" recoverable from marital community property, property jointly held by the insured and his/her "spouse" or property transferred from an insured to his/her "spouse"; provided, there is no coverage under this policy for "written claims" arising out of any actual or alleged "wrongful acts" of said "spouse".

G.  The executor, administrator, guardian or other legal representative of an insured who dies, becomes incompetent, or bankrupt, but only while acting in his/her capacity as such and with respect to "wrongful acts" for which said deceased, incompetent or bankrupt insured would otherwise be covered under this policy.

## SECTION V --- LIMITATIONS ON OUR LIABILITY AND RETENTION

A.  LIMITS OF LIABILITY

This policy may provide coverage for a number of insureds.  Regardless of the number of insureds under this policy, the number of "wrongful acts", the number of claimants or "written claims" presented to us or "suits" brought, or the amount of "defense costs" incurred, the most we will pay under this policy is as follows:

1. Policy Aggregate.  The applicable Policy Aggregate Limit of Liability shown in Item 5 of the Declarations or an endorsement is the most we will pay for or on behalf of all insureds under this policy for all "damages" and "defense costs" combined because of all "wrongful acts" to which this policy applies.

2. "Representative" Aggregate.  If a "Representative" Aggregate is specified in the Declarations, subject to the above provision with respect to Policy Aggregate, the most we will pay for all "damages" and "defense costs" combined for, on behalf of, or arising out of or as a result of all "wrongful acts" to which this policy applies committed by a "representative", or by any "individual" for whose acts said "representative" is legally responsible, or by any "affiliate" of said "representative" which is a named insured, is the Limit of Liability shown in Item 5. of the Declarations or an endorsement as "Representative" Aggregate.

3. Each "Wrongful Act" Aggregate.  Subject to the above provisions with respect to Policy Aggregate, and "Representative" Aggregate if applicable, the most we will pay for or on behalf of all insureds under this policy for all "damages" and "defense costs" combined because of a "wrongful act" or a series of continuous, repeated or "interrelated wrongful acts" to which this policy applies, is the applicable Each "Wrongful Act" Aggregate Limit of Liability shown in Item 5 of the Declarations or an endorsement.

   All "written claims" for "damages" and related "defense costs" which arise out of a "wrongful act", or a series of continuous, repeated or "interrelated wrongful acts", will be considered to have arisen out of a single "wrongful act" for these purposes, and such claims will be subject to the applicable Each "Wrongful Act" Aggregate Limit of Liability.  For example, and without limiting the foregoing, all claims arising out of the failure to adequately disclose the risks associated with the same "security", or the failure of a "broker"-"dealer" to perform adequate due diligence on the same "security", would be considered to have arisen out of a single "wrongful act" and would be subject to the Each "Wrongful Act" Aggregate Limit of Liability.

4. If any "written claim" covered by this policy is also covered by one or more other policies issued by us, or by any insurer "affiliate" of ours, then with respect to such claim:  (a) we shall not be liable under this policy for a greater proportion of the "damages" and "defense costs" than the applicable Limit of Liability under this policy bears to the total applicable Limits of Liability of all such policies; and (b) the maximum amount payable under all such policies shall not exceed the applicable Limit of Liability of that policy referred to above which has the highest applicable Limit of Liability.

B.  "DAMAGES" AND "DEFENSE COSTS" INCLUDED IN LIMITS OF LIABILITY

All amounts paid with respect to a "wrongful act", including amounts paid as "damages" and amounts paid as "defense costs", are subject to the applicable Limit of Liability.  All "defense costs" with respect to "written claims" or "suits" arising out of a covered "wrongful act" shall be paid and applied first to the applicable Limit of Liability, and the difference between such Limit of Liability and the "defense costs", if any, shall be the amount available to pay "damages" incurred in connection with such "written claims" or "suits".  The Each "Wrongful Act" Aggregate Limit of Liability shall be excess over the applicable "retention".

C.  RETENTION

The First Named Insured shall pay all "damages" and "defense costs" incurred with respect to each "wrongful act" for which "written claims" are presented to us, up to the amount of the applicable "retention".  The "retention" shall apply to each "wrongful act" and shall be borne by the insured and remain uninsured.  The "retention" amount shall first be applied to the payment of "defense costs".  If we so request, the First Named Insured shall make direct payment within the "retention" amount to appropriate other parties.  We will only be liable for and will only pay "damages" and "defense costs" with respect to each "wrongful act" which exceed the applicable "retention" and which do not exceed the applicable Limit of Liability.  We may, at our sole option, advance the payment of such "retention" in order to facilitate the settlement or defense of a "written claim" or "suit".  In this event, the First Named Insured shall reimburse us for such advance within ten days of receipt of our statement therefore.


SECTION VI --- WHAT WE DO NOT COVER - EXCLUSIONS

The insurance afforded by this policy, including any obligation to defend or pay "defense costs", does not apply to the following.

A.  Other Types of Insurance Coverage.  This policy is intended to provide coverage for professional liability arising out of negligence in the performance of "financial services" for "clients" of named insureds.  It is not intended to provide coverage for those types of claims or liability which are typically covered by other types of insurance policies or coverage such as comprehensive general liability policies, homeowners policies, automobile policies, workers compensation or employers liability policies, directors and officers liability policies, employment practices liability policies, or financial institutions or other forms of fidelity or other types of bond coverage or their equivalent, whether or not the insured has, or is covered by any such insurance or bonds, and whether or not the coverage provided by such insurance or bonds has been exhausted by the payment of loss, excludes coverage for such claims or is otherwise insufficient to cover any such claims.  Therefore, we will not cover, either on a direct insurance basis or as excess insurance, claims arising out of or in connection with actual or alleged:  (1) bodily injury to or sickness, disease, mental illness or death of any "individual", including, without limitation, any claim for mental or emotional distress or humiliation or any claim arising out of sexual harassment; provided, this exclusion does not apply to mental illness, emotional distress or humiliation arising out of "publication injury"; (2) owning, entrusting, using, taking care of, loading or unloading of any automobile, mobile equipment, watercraft or aircraft or any claim with respect to physical damage to or loss of use of tangible property; (3) theft, embezzlement, forgery, alteration, computer systems fraud, or any other dishonest or fraudulent act of the type intended to be covered by a financial institution bond or other form of fidelity bond or its equivalent; (4) injury to an "individual" arising out of or related to his/her employment or application for employment; or injury which arises out of acts of discrimination which are prohibited by any law, order or regulation, including, without limitation, discrimination based on age, color, race, sex, sexual preference, creed, national origin, ancestry, physical or mental handicap, marital status or pregnancy; (5) claims made by or on behalf of present, past or future partners, members, stockholders or employees, as such, of an insured against the partners, members, directors, officers or employees of said insured.

B.  Dishonesty Or Fraud / Personal Advantage / Non Public Information.  We do not cover claims which arise out of or are contributed to by an act, committed by or at the direction of any insured, or ratified by any insured, or which the insured knew was being committed but failed to take any action to stop, and which act is dishonest, fraudulent, criminal, malicious or knowingly wrongful, including, without limitation, the willful violation of any laws, orders, rules or regulations of the United States, or any state, commonwealth, territory, subdivision or municipality thereof, or the Securities Exchange Commission, the National Association of Securities Dealers, Inc. or any state insurance department or other regulatory authority, including, without limitation, laws, orders, rules and regulations prohibiting churning or twisting.  We do not cover claims arising out of any insured's actual or alleged gaining of any profit or advantage to which the insured was not legally entitled, including, without limitation, any profit or advantage as a result of the commingling of funds or accounts.  We do not cover any claims arising out of the actual or alleged use by any insured of, or the aiding or abetting by any insured in the use of, or the participation after the fact by any insured in the use of non-public information in a manner prohibited by applicable law, rule or regulation.

C.  Assumed Liability / Guaranteed Performance / Tax Deductions / Fees For Services.  We do not cover any liability which any insured assumes under any contract or agreement, whether written or oral; but this does not apply to liability the insured would have with respect to the provision of "financial services" even in the absence of such contract or agreement and which liability is otherwise covered under the terms of this policy.  We do not cover claims which arise out of:  the failure of "securities" or other investments to perform according to any insured's warranty, guarantee or contractual agreement, whether written or oral; or a disallowed tax deduction, credit or other item on a tax return which the insured's "client" would owe, or would not be entitled to, even in the absence of any negligence on the part of an insured.  We do not cover claims, or that portion of any claim, arising out of disputes over the amount of, or for the return of or reimbursement of fees, commissions or other forms of compensation paid to any insured in connection with the provision of "financial services", including, without limitation, any "suit" or counter claim filed by an "individual" or "entity" subsequent to the institution of "suit" against such "individual" or "entity", or an "affiliate" by an insured for payment of professional fees, commissions or other sums.

D.  Other Named Professions Liability.  Except as may otherwise be specifically provided by endorsement, we do not cover claims arising out of any actual or alleged liability an insured may have as a result of an insured's activities with respect to, or an insured's provision of services normally provided by, any type of business or professional, other than as a "financial services professional", including, without limitation, an insured's activities, whether or not licensed or otherwise authorized to act as such, as an:  accountant; actuary; "broker" or "dealer"; enrolled agent authorized to practice before the Internal Revenue Service; lawyer; mortgage broker; property or casualty insurance agent, broker or solicitor; third party administrator; real estate agent or broker; tax preparer; general agent of a life insurance company, unless he/she has no subagents and is not supervising any other agents; managing general agent, underwriting manager, program manager or similar designation of a life insurance or property and casualty insurance company; or securities analyst.  This exclusion applies regardless of whether the insured has other insurance to cover such activities or whether such activities are excluded under such other insurance.  But this exclusion does not apply to advice given by an insured on property and casualty insurance, personal risk management, investment management, estate planning or taxes as part of the insured's activities as a "financial services professional".

E.  Fiduciary Under ERISA.  Except as may otherwise be specifically provided by endorsement, we do not cover claims which arise out of actual or alleged services an insured performs as a trustee, plan administrator or fiduciary under the Employee Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), including any amendment, regulation or enabling statue pursuant thereto, or any other similar federal, state, or provincial statute, regulation or order issued pursuant thereto.  But this exclusion does not apply to retirement plan design, investment  advice and related "securities" or insurance purchases or sales by the insured within the normal scope of retirement or benefit planning services performed by a "financial services professional".

F.  Discretionary Accounts / Investment Discretion.  Except as may otherwise be specifically provided by endorsement, we do not cover claims which arise out of or in conjunction with:  services any insured performs under a "discretionary account agreement"; or the exercise of "investment discretion" whether pursuant to a "discretionary account agreement" or otherwise.

G.  Other Businesses, Organizations Or Funds.  We do not cover claims:  (1) made against an insured and which arise out of or in conjunction with or which are in any way related to the actual or alleged operation, management or ownership of any business or "entity" which is not a named insured on this policy, including, without limitation, any business (including, without limitation, the ownership, maintenance or care of any property in connection therewith) which, in whole or in part, is or was owned, controlled, operated or managed, directly or indirectly, by an insured, by an insured's parent company, by an "affiliate" or subsidiary of an insured, by any "related individual" of an insured, or of which an insured is or was a sponsor, administrator, officer, director, stockholder, partner, member, trustee or employee; or (2) which are made by or in the right of any business or "entity" which is or was owned, controlled, operated or managed, directly or indirectly, in whole or in part, by an insured or by a "related individual" or "affiliate" of an insured or in which an insured or any "related individual" of an insured is or was an officer, trustee, director, manager, partner, shareholder, employee or independent contractor; or (3) which  arise out of or in connection with the actual or alleged operation or administration of any pension, welfare, profit sharing, mutual or investment fund or trust, or employee benefit plan or trust of which an insured is or was a sponsor officer, trustee, director, manager, partner, shareholder, employee or independent contractor.

H.  General Or Limited Partnership Or Syndicate / Asset Management / Charitable Entities / Proprietary Products.  We do not cover claims which arise out of or are in any way related to the actual or alleged forming, syndicating, operating, administering or managing of the assets of a general or limited partnership, real estate investment trust, joint venture or any other type of venture or syndicate, or any type of charitable enterprise or "entity", by an insured or an "affiliate" or "related individual" of an insured.  We do not cover claims which arise out of or are in any way related to the actual or alleged forming, syndicating, operating, administering, managing or sale of any proprietary product of an insured, or an "affiliate" or "related individual" of an insured, including without limitation, any mutual fund or other investment product developed or managed by an insured.

I.  Insolvency Or Bankruptcy.  We do not cover claims which arise out of the actual or alleged insolvency, receivership, bankruptcy, liquidation, reorganization or financial inability to pay of any:  insured; bank or banking firm; trust, title or escrow company; law firm; "broker" or "dealer"; clearing agency; insurance company or reinsurer; or pool, syndicate, association or other combination formed for the purpose of providing insurance or reinsurance.

J.  Fines, Penalties, Sanctions, Taxes, Punitive Or Exemplary Damages, Or Public Policy.  We do not cover claims for any amounts the insured may be required to pay as:  civil or criminal fines, penalties, or sanctions; taxes; punitive or exemplary "damages", including, without limitation, double or treble "damages" or

any "damages" in excess of actual "damages"; or claims with respect to any matter deemed uninsurable under the law pursuant to which this policy shall be construed; however, this exclusion shall not apply to civil fines, penalties or taxes which an insured is legally obligated to pay to a "client" of a named insured or a "representative" and which were incurred solely as a direct result of covered "wrongful acts" committed in connection with the provision of covered "financial services" for said "client" by  a named insured or a "representative" named on this policy and which fines, penalties or taxes would not have been owed by the "client" in the absence of such "wrongful acts".

K.   Investment And Financial Product Approval By First Named Insured.  We do not cover that part of any claim which arises out of or in connection with any "private securities transaction".

L.   Non Clients.  We do not cover claims of a claimant who is neither a "client" of a named insured or  "representative", nor the executor, administrator, guardian or other legal representative of such a "client".  This includes, without limitation, any "individual" or "entity" who/which buys with the intent of selling to others or sells with the intent that the buyer sell to others or which provides services as part of a chain of services to the ultimate consumer including, without limitation:  a "broker"-"dealer" which is not buying, selling or trading as a principal for its own account; investment bankers; mutual funds; limited partnerships; banks, savings and loan companies and other financial institutions; transfer agents; clearing agencies; the SPIC; custodians; and investment adviser entities, such as companies providing asset allocation models or services to "registered investment advisers".

M.   Economic Forecasts / Products.  We do not cover claims which arise as a result of any actual or alleged economic forecast provided by an insured as a separate service and not provided, without additional charge, as part of the insured's "financial services" to a "client".  We do not cover claims arising out of the actual or alleged manufacture, leasing, distribution, preparation, design or sale of any non "securities" or non-insurance product by an insured, including, without limitation, any computer hardware or software.  We do not cover any claim arising out of any actual or alleged infringement of trademark, patent or copyright.

N.   Exotic Investments / Tangible Assets.  We do not cover claims which arise out of or are in any way related to actual or alleged arbitrage, short sales (except short against the box), trading or failure to trade derivatives, including, without limitation, interest rate swaps, collateralized mortgage obligations, structured notes, commodities, commodities futures contracts or any type of option, or future, or futures option contract or similar investments or investment products including, without limitation, commodity pools or partnerships engaged in the investment in or trading of such "securities", or the sale of viaticals.  We do not cover claims arising out of the actual or alleged trading or failure to trade hedge funds.  We do not cover claims which arise out of any actual or alleged transaction involving tangible personal property, directly or through a "security" conveying ownership or an interest therein, including, without limitation, precious metals, gemstones, stamps, art objects, antiques or other collectibles or any security interest in tangible personal property; however, this exclusion does not apply to claims arising out of transactions involving gold or silver.

O.   Prior Acts / Unnamed Financial Services Professionals / Known Claims or Incidents / Troubled Securities.  We do not cover claims arising out of any actual or alleged "wrongful act", or series of continuous, repeated or "interrelated wrongful acts":  which occurred, or the first of which occurred, prior to the insured's applicable "retroactive date"; or with respect to which a "written claim" has previously been presented to us, or to any other insurer, prior to the inception of this policy; or committed by or involving an insured and occurring, or the first of which acts occurred, prior to the effective date of coverage for said insured under this policy, or any predecessor policy issued by us of which this policy is a renewal, replacement or successor in time, if the insured knew or should have known, by consulting his/her/its records or otherwise, that said "wrongful act" was likely to result in a claim; or arising out of or involving the same or similar circumstances, acts, errors, or omissions as any claim or "suit" against an insured, or other litigation which occurred or was pending prior to the effective date of coverage for the insured under this policy, including, without limitation, the purchase, sale or advice regarding the same "security" as that involved in said litigation; or involving the purchase, sale or advice with regard to "securities" known to be in financial trouble prior to the effective date of this policy.  We do not cover claims arising out of or in any way related to the actual or alleged activities of any "financial services professional" who is not named on this policy; provided, a "financial services professional" will be considered to be named on this policy as of the date he/she is employed or contacted as a "representative" of the First Named Insured if we are requested by the First Named Insured to provide coverage for said "representative" under this policy within thirty days of said employment or contract, and we have approved that request, and any additional premium has been paid by the First Named Insured within fifteen days of receipt of our invoice therefor.

P.   Claims Between Insureds / Affiliates / Related Individuals.  We do not cover claims made by or on behalf of:  one insured under this policy against another insured under this policy, including, without limitation, any claim by an insured against a partner, officer, director, member, employee or independent contractor of such          insured; or an "entity" or enterprise which one or more insureds do or did wholly or partly own, operate, control, or manage, directly or indirectly, or of which an insured or any "related individual" is or was a sponsor, administrator, officer, director, stockholder, partner, member, trustee, employee or independent contractor, or which wholly or partly does or did own, operate, control, or manage, directly or indirectly, or which is or was a subsidiary or "affiliate" of an insured; or by a present, former or prospective employer, proprietor, partner, officer, principal, director, member, owner, shareholder, employee, independent contractor or "related individual" of an insured.

Q.   Underwriting, Syndicating Or Investment Banking.  We do not cover claims arising out of or in connection with any actual or alleged underwriting, syndicating, or investment banking work, or associated counseling, advising or investment activities, including, without limitation, any aspect of any actual, attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, reorganization, consolidation, capital restructuring, recapitalization, spin-off, primary or secondary offering of "securities" (regardless or whether the offering is a public offering or a private placement), business valuation, or other efforts to advise, raise or furnish capital or financing for any enterprise or "entity", or any disclosure requirements in connection with any of the foregoing.

R.   Destruction Of Documents / Machine Or System Failure / Computer Related And Other Electronic Problems / Data Processing.  We do not cover claims arising directly or indirectly out of actual or alleged loss of, damage to, destruction of, or the inability to utilize or access any machines or systems (including, without limitation, telephonic, data processing and computer systems, equipment or component parts), records, papers, accounts, data or other information from any cause, including, without limitation, mechanical or electronic failure or malfunction or "computer-related and other electronic problems".  "Computer-related and other electronic problems" means the inability of computer hardware, computer software, computer microprocessors or other computer system

component parts to recognize, distinguish, interpret, accept or process data (including, without limitation, calculating, comparing, storing, inputting, manipulating, updating, recording, displaying, outputting, transferring, or sequencing data).  We do not cover claims arising indirectly or indirectly out of data processing services performed for others.

S.  Nuclear Reaction / Pollution.  We do not cover any claims alleging, based upon or arising out of nuclear reaction, radiation or radioactive contamination.  We do not cover claims alleging, arising out of, based upon, attributable to or in any way involving, directly or indirectly, pollution, regardless of cause, including, without limitation, (1) the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants", or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize "pollutants".  "Pollutants" includes, without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, infectious or otherwise, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste".  "Waste" includes, without limitation, materials to be recycled, reconditioned or reclaimed.

T.  Foreign Trading / Market Specialist / Clearing or Transfer Agencies / "Penny Stocks".  We do not cover claims arising out of the actual or alleged:  (1) trading or failure to trade in any "security" traded exclusively outside of the United States of America, its territories and possessions and Canada; (2) function of any insured as a specialist or market maker for any "security" or arising out of failure to make a market for any "security"; or (3) activities in connection with any equity "security" priced under $5.00; however, this exclusion shall not apply if the equity "security" is (a) registered, or approved for registration upon notice of issuance, on a national securities exchange in the United States, or (b) authorized, or approved for authorization upon notice of issuance, for quotation in the NASDAQ National Market System or Small Cap Market; or (c) issued by an investment company registered under the Investment Company Act of 1940 (as amended).  We do not cover claims brought by or on behalf of any clearing agency or transfer agent or arising out of any actual or alleged function of any insured as a clearing agency or transfer agent.  We do not cover claims of any "individual" or "entity" through which an insured sold any investment or insurance product.

U.  Trust Or Estates / Trustees And Fiduciary Services.  We do not cover claims arising out of any loss sustained by an insured as a beneficiary or distributee of any trust or estate.  We do not cover claims arising out of an insured's actual or alleged services or capacity as a trustee or fiduciary (other than his/her liability as a fiduciary solely by reason of his/her acts as a "financial services professional"), including, without limitation, the insured's services or capacity as (1) a trustee for any "individual", business or charitable undertaking or enterprise, (2) a trustee of a testamentary or intervivos trust, (3) a member of a protective committee of security holders in connection with any bankruptcy, reorganization or similar proceeding, (4) a trustee of the debtor in any bankruptcy, reorganization or similar proceeding, (5) a receiver or assignee for the benefit of creditors in any judicial or non-judicial receivership or similar proceedings, or (6) an administrator, conservator, executor or guardian for others.  We do not cover claims against any insured arising out of his/her actual or alleged acts as a "registered investment adviser" or "associated person" with respect to any "individual", "entity' or activity when he/she is also acting as a trustee, administrator, conservator, executor or guardian with respect to that "individual", "entity" or activity.

V.  Life Insurance Agent Additional Exclusions.  We do not cover claims arising out of or in connection with any actual or alleged:  (1) financial inability to pay, insolvency, receivership, bankruptcy or liquidation of (a) any insurer, reinsurer, pool, syndicate, association or other combination formed for the purpose of providing insurance or reinsurance, or (b) any Multiple Employer Trust or Welfare Arrangement or any pool, syndicate, association or other combination formed for the purpose of providing insurance or benefits when they are not fully funded by an insurance product; (2) promise, indication or guarantee as to the effect of fluctuations of interest rates with respect to future premium payments or market values (e.g., with respect to variable premium policies); (3) liability arising out of duties or activities assumed under contract by an insured as a plan administrator or fiduciary under the Employment Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), including any amendment, regulation or enabling statue pursuant thereto, or any other similar federal, state, or provincial statute or regulation; (4) failure of an HMO or PPO to pay the salaries or fees of any practitioner, or the insolvency, receivership or liquidation of an HMO or PPO or the quality of care rendered by, or the alleged malpractice of a participating provider of services of any HMO or PPO; (5) insurance product which is not approved for sale in the state in which the product was sold; (6) churning or twisting of insurance policies or annuities; (7) sale of viaticals.

SECTION VII --- CONDITIONS

A.   Premium.  All premiums for this policy shall be computed in accordance with our rules, rates, rating plans and procedures applicable to the insurance afforded herein.  The premium specified in the Declarations as Minimum Annual Premium is the minimum premium due on this policy for coverage for the full "policy period" specified in the Declarations.  The premium specified in the Declarations as Minimum Policy Premium is the minimum premium for this policy regardless of the actual "policy period".  Any premium paid on this policy which relates to a prior policy period for the insured shall be fully earned as of the date of payment and shall not be included as part of the Minimum Annual Premium or Minimum Policy Premium due for this policy nor shall it be considered when setting the premium to be paid for an "extended reporting period endorsement".

The First Named Insured shall maintain records of such information as is necessary for premium computation and shall send to us, at our request, copies of such records at the end of the "policy period" and at such times during the "policy period" as we may request.

B.  Duties In The Event Of Error, Omission, Claim Or Suit.  As soon as an insured knows of an alleged "wrongful act" which may result in a "written claim" covered by this policy, the insured must give us written notice as soon as practicable of the details of the "wrongful act", including the circumstances giving rise to the "wrongful act", a description of the services provided or that should have been provided, the name and address of any potential claimant and the type and amount of injury suffered by said claimant.  Include as many details as possible.  If a "written claim" is made or "suit" is brought against an insured, the insured, as a condition precedent to our obligations under this policy, must immediately send us every demand, notice, summons or other process relating to said claim or "suit"; provided, except as provided in SECTION II A. 3. or SECTION VII K, in no event shall such "written claim" or "suit" be accepted by us later than the last day of the insured's "policy period".  All notices called for in this paragraph must be provided to us by a separate document, and not just as part of a renewal application for insurance.  The insured shall authorize us to obtain all records and other information we deem necessary for the settlement, negotiation or defense of a "written claim" or "suit".

The insured must cooperate with us in the investigation and defense of a "written claim" or "suit". At our request, the insured must: submit to examination under oath; assist us in making settlements or conducting "suits"; and attend and assist in obtaining the attendance of witnesses at hearings, depositions, arbitration proceedings, trials and other proceedings. The insured must cooperate with us in enforcing any right the insured may have against any "individual" or "entity" for contribution or indemnity. The insured must not, except at the insured's own cost, voluntarily pay any money, assume any obligation or incur any expense without our prior written consent.

C. Suits Against Us. No suit or other action may be brought against us unless, as a condition precedent thereto, there has been full compliance with all the terms and conditions of this policy and the obligation of the insured to pay "damages" has been finally determined either by judgment against the insured after actual trial or arbitration or by written agreement signed by the insured, the claimant and us. Anyone who has obtained such a judgment or written agreement will be entitled to recover under this policy to the extent of the insurance then available to the insured under this policy. No one has the right to make us a party to a suit to determine the liability of an insured; nor shall we be impleaded by an insured or his/her/its legal representative(s).

D. Disputes With Us / Arbitration. By accepting the coverage provided by this policy, the insured agrees to be bound by the following arbitration rules in the event that a dispute arises between the insured and us, our employees, agents or representatives with respect to coverage, liability for premiums or "retentions", any item or condition of this policy, or any other matter arising out of or related to this policy or the relationship between us, our employees, agents and representatives and the insured under this policy.

1. By this arbitration agreement (1) the parties intend to simplify the dispute process by the non-judicial resolution of any dispute concerning their relationship, and (2) make it possible for us to reduce our litigation costs by resolving all disputes through arbitration in Mountain View, California.

2. In the event of any such dispute, the matter shall be resolved by binding arbitration before three privately selected arbitrators acting pursuant to the arbitration provisions of the California Arbitration Act, Sections 1280 through 1294.2 of the Code of Civil Procedure. If a dispute subject to arbitration hereunder should arise, either party may make a demand for arbitration by filing a demand in writing with the other party. There shall be three arbitrators, one named in writing by each of the parties within ten days after demand for arbitration is given and a third chosen by the two appointed arbitrators. The arbitrators appointed by the insured and us need not be independent, and may be lawyers for the parties. The third arbitrator must be an "individual" with experience in the financial services professional liability insurance industry. Should either party refuse or neglect to join in the appointment of the arbitrator(s) or to furnish the arbitrator(s) with any papers or information demanded, the appointed arbitrator(s) is/are empowered by both parties to proceed ex parte. Arbitration shall take place in Mountain View, California, and the hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within said city as is selected by the arbitrator(s). The arbitrator(s) shall select such time and place promptly after his/her (or their) appointment and shall give written notice thereof to each party at least 20 days prior to the date so fixed.

3. The arbitrators shall apply the law of the State of California.

4. At the hearing, either party may present any relevant evidence and the formal rules of evidence applicable to judicial proceedings shall not govern. Evidence may be admitted or excluded in the sole discretion of the arbitrator(s). Said arbitrator(s) shall hear and determine the matter and shall execute and acknowledge their award in writing and cause a copy thereof to be delivered to each of the parties. The decision of any two arbitrator(s) shall be final, binding and conclusive, and not subject to court review except as provided under California law. The submission of a dispute to the arbitrator(s) may be rendered by any Superior Court having jurisdiction; or such Court may vacate, modify, or correct the award in accordance with the prevailing sections of the California Arbitration Act. If three arbitrators are selected under the foregoing procedure but two of the three fail to reach an agreement in the determination of the matter in question, the matter shall be decided by three new arbitrators who shall be appointed and shall proceed in the same manner, and the process shall be repeated until a decision is finally reached by two of the three arbitrators selected. The costs of such arbitration shall be borne equally by the parties or in such proportions as the arbitrator(s) shall determine.

5. If any party seeks to avoid these arbitration provisions, and any court shall be asked by either party to make any order concerning any dispute or controversy in any way concerning the matters set forth above, the parties agree that the court shall apply California law. The parties also agree to request the court to abate any such proceeding pending transfer to the courts of California for determination of the validity of these arbitration provisions.

6. Each party shall appoint and pay for any counsel appointed to represent it in such arbitration, unless otherwise provided by law.

This Section is not to be construed to give a right of action against us, our employees, agents or representatives by any one who is not an insured under this policy.

E. Bankruptcy, Death, Incompetence Or Insolvency. The bankruptcy, death, incompetency or insolvency of an insured will not relieve us of any of our obligations under this policy; in such event, this policy shall inure to the benefit of the legal representative of such insured, but only to the extent said insured was insured under this policy.

F. Other Insurance. If there is other valid and collectible insurance which would apply to a "written claim" in the absence of this policy, this policy will apply as excess insurance over that other insurance whether such insurance is stated to be primary, contributory, excess, contingent, self insurance or otherwise unless such other insurance is written solely as excess insurance over this specifically identified policy; provided, with respect to any "written claim" first presented to an insured within the last fifteen days of said insured's "policy period" and then presented to us within fifteen days immediately following the effective date of cancellation or non-renewal of coverage with respect to such insured, there shall be no coverage under this policy unless, as condition precedent thereto, that insured has not procured or does not have available to him/her/it other insurance which applies to said "written claim" or which would apply to said "written claim" in the absence of this policy.

G.  Our Right To Recover From Others.  If we make any payment under this policy, the insured's right to recover from anyone else for the acts giving rise to that payment becomes ours to the extent of our payment.  The insured must sign any required documents and take any steps necessary to help us secure these rights.  The insured must do nothing to impair any of our rights.

The insured may have a right to recover from another insured under this policy relating to claims paid by us.  We will not exercise our rights against such other insured except with respect to a "written claim" which arises from or is contributed to by an intentional, dishonest, fraudulent, criminal or malicious act, error or omission of such other insured.

If we recover any amounts from another party relating to a "written claim" under this policy, after we deduct an amount equal to the "damages" and "defense costs" we have paid or incurred and the costs of making the recovery, we will share the rest of the recovery with the following parties:  first, we will pay to an insured up to the amount the insured has paid relating to the "written claim" which is in excess of this policy's applicable Limit of Liability; second, we will pay the First Named Insured the amount of the "retention" which the First Named Insured has paid on that "written claim".

H.  Audit.  We may examine and audit an insured's books and records as they relate to this insurance at any time during the "policy period" and during the three years immediately following the end of the "policy period" for the insured.

I.  Change In This Policy.  Notice to any agent or knowledge possessed by any agent or other "individual" or "entity" acting on our behalf shall not effect a waiver of or a modification of any term of this policy or stop us from asserting any rights under the terms of this policy, nor shall the terms of this policy be changed or waived except by an endorsement issued by us and made a part of this policy.  If a change in the policy requires a premium adjustment, we will adjust the premium as of the effective date of the change.

J.  Cancellation.  The First Named Insured may cancel this policy entirely, or as to any insured under this policy, at any time by giving us written notice stating when, thereafter, the cancellation is to take effect.

We may cancel this policy at any time in its entirety, or as to any insured, by sending to the First Named Insured written notice at least thirty days prior to the date cancellation is to be effective; provided, if the First Named Insured fails to pay premium when due or to reimburse us for our payment of any portion of a "retention", we may cancel this policy at any time by sending to the First Named Insured written notice at least ten days prior to the date cancellation is to be effective.  In either case, we will give the First Named Insured written notice of cancellation by mailing it to the last mailing address known to us for the First Named Insured.  Proof of mailing thirty days or ten days, respectively, before the effective date of such cancellation will be sufficient proof of notice of cancellation.

This policy shall automatically be canceled as to any insured as of the effective date said insured's license, registration or other right to provide "financial services" or practice as a "financial services professional" is non renewed by the insured or revoked, suspended by or surrendered at the request of any regulatory authority.

In case of cancellation by the First Named Insured, or by the insured's premium finance company, we will refund unearned premium on the usual short rate basis, subject to retention by us of the Minimum Policy Premium specified in the Declarations and less any sums due us under this policy.  For these purposes, automatic cancellation as per the above sub paragraph or cancellation as a result of the First Named Insured's failure to pay premium or "retentions", or due to the failure of an insured to comply with any of the other terms or conditions of this policy, or the concealment or misrepresentation of any material fact on the insured's "Application" or the failure to disclose material changes in the information on that "Application", shall be deemed cancellation by the First Named Insured.

In case of cancellation by us, we will refund any unearned premium on a pro rata basis, subject to retention by us of the Minimum Policy Premium specified in the Declarations and less any sums due us under this policy.  If we do not refund the unearned premium with the notice of cancellation, we will refund it within a reasonable time after the date cancellation is effective; but refund or tender of the unearned premium is not required to make a valid cancellation of this policy.

K.  Extended Reporting Period.  If we cancel or fail or refuse to renew this policy, in total or as to any named insured, for any reason other than the failure to pay premium due or any part of the "retention" which we have advanced, or the failure to comply with any of the other terms or conditions of this policy, or the concealment or misrepresentation of any material fact on the insured's "Application" or the failure to disclose material changes in the information on that "Application", or the revocation, suspension or surrender, at the request of any regulatory authority, of the insured's license or other right to provide "financial services" or practice as a "financial services professional", the First Named Insured has the right to have issued an endorsement providing a one year extended period of time, following the effective date of said cancellation  or non renewal, during which an "individual" or "entity" who/which was an insured immediately prior to the effective date of said cancellation or non renewal may present to us "written claims" arising out of "wrongful acts" occurring during the "coverage period" for said insured and otherwise covered under the terms of this policy.  During this "extended reporting period", any "written claim" presented to us by an insured resulting from a "wrongful act," or a series of continuous, repeated or "interrelated wrongful acts", for which a "written claim" had been presented to us under the terms of a predecessor policy issued by us or by an "affiliate" insurer of ours, of which this policy is a renewal or one of a series of continuous renewals or successor policies, will be treated as if it had been presented to us during the last day of coverage under that predecessor policy and will be covered by that predecessor policy, not this policy, subject to all the terms and conditions of that predecessor policy, including, without limitation, its applicable Limit of Liability.

While this policy, or any policy which is a renewal of this policy or one of a series of continuous renewals of this policy, is in effect, we will continue to cover all remaining insureds, without the need to purchase an "extended reporting period endorsement", with respect to "written claims", otherwise covered under the terms of this policy or said renewal policy, as applicable, arising out of "wrongful acts" committed by a "representative who has ceased to be associated with the First Named Insured; provided, this continuing coverage shall not apply in the case of a departed "financial services professional" as to whom we have canceled coverage or refused to renew coverage or who has been terminated for cause by the First Named Insured or any other insured.  In the latter cases, it

FNX-P-61 (12-07)                                        Page 11 of 12

will be necessary for the First Named Insured to buy an "extended reporting period endorsement" covering that "financial services professional", as otherwise provided in this subsection, for there to be any continuing coverage for any insured with respect to "written claims" arising out of the "wrongful acts" of said "financial services professional".

If the First Named Insured purchases an "extended reporting period endorsement" following cancellation or non-renewal of this policy, we will also cover, pursuant to the terms of that endorsement, each "financial services professional" who was a named insured on this policy, as of such cancellation or non-renewal date, for "written claims" arising out of "financial services", otherwise covered under the terms of this policy, which were rendered during the "coverage period" for that "financial services professional".

To obtain an "extended reporting period endorsement", the First Named Insured must, within thirty days of the effective date of such cancellation or non-renewal, give us written notice requesting the issuance of such an endorsement and pay an additional premium for that endorsement as determined by our rules, rates, and regulations in effect at that time.  If the First Named Insured fails to purchase an "extended reporting period endorsement" within that thirty day period, there will be no further coverage under this policy with respect to any insured affected by said cancellation or non-renewal, effective as of the effective date of such cancellation or non-renewal.  We have no obligation to offer an "extended reporting period endorsement" to anyone other than the First Named Insured.  The insurance we provide during an "extended reporting period" will be excess over any other valid and collectible insurance available to the insured.  The "extended reporting period" will not reinstate or increase the Limits of Liability or extend the "policy period".  All premium paid for an "extended reporting period endorsement" shall be fully earned by us upon issuance of the endorsement and will not be refunded.

If we do not offer to renew this policy at the same premium, Limits of Liability or "retention" as apply to this policy, this will not be considered a cancellation or non-renewal by us.

L.  Concealment, Misrepresentation, Fraud Or Material Change.  We will not provide any coverage under this policy to an insured who intentionally conceals or misrepresents any material fact or circumstance relating to this insurance, including, without limitation, any misstatement of fact, material misrepresentations or failure to disclose material facts on the "Application", or who fails to tell us during the "policy period" of material changes in the information provided to us on said "Application".  In the case of concealment or misrepresentation of any material fact or circumstance relating to this insurance, we shall have the right, at our sole option, to deny any coverage under this policy for any claim relating to such material fact or circumstance, or to rescind coverage under this policy with respect to the insured involved, or rescind this policy in its entirety, thereby voiding all coverage under this policy.  In the later case, the Minimum Policy Premium stated on the Declarations shall be reduce by fifty percent, and all other premium paid with respect to this policy shall be returned to the First Named Insured.  In all other cases, there shall be no change in premium.

M.  Transfer Of Insured's Rights And Duties.  An insured may not transfer or assign any rights or duties under this policy unless we give our written consent to that transfer or assignment by endorsement to this policy.

N.  Multiple Insureds.  More than one "individual" or "entity" may be named as an insured under this policy.  The inclusion of multiple insureds under this policy will not increase our liability beyond the Limits of Liability set forth in SECTION V.

By accepting this policy, the insureds agree that the First Named Insured is authorized to act on behalf of all other insureds with respect to:  giving and receiving notices of cancellation or non-renewal; accepting any endorsement issued to be a part of this policy; paying premiums and "retentions"; receiving any return premium which may become due; giving notices to insureds that they have been added to or deleted from this policy; informing other insureds of the policy terms and conditions; requesting an "extended reporting period endorsement"; and keeping us informed of any material changes in the type or composition of the business or organization of the insureds under this policy.

O.  Merger.  If, during the "policy period", any insured shall acquire or be acquired or merged, consolidated or otherwise combined with any other "entity", immediate written notice of that fact must be give to us.  There shall be no coverage under this policy with respect to any "wrongful acts" committed by an insured, or any of its employees, agents or representatives, subsequent to the date of said acquisition, merger, consolidation or other combination unless this policy is endorsed by us to provide such coverage.  There shall be no coverage under this policy with respect to the merged, consolidated or combined "entity" unless we issue an endorsement to provide such coverage.

P.  Claims, Notices And Requests.  All "suit" papers and other "written claims" under this policy  shall be sent to us c/o ProSurance Group, Inc. at 2685 Marine Way, Suite 1408, Mountain View, CA 94043.  All other notices, demands or requests provided for in this policy shall be in writing and sent to us c/o ProSurance Group, Inc. at 2685 Marine Way, Mountain View, Suite 1408, CA 94043.

This policy shall not be valid unless countersigned below by our authorized agent or representative.


Countersigned by our authorized agent / representative


_____
                  John V. Wagner



## Underwritten by: National Casualty Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive
Scottsdale, Arizona 852581-800-423-7675
A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                    President

The information contained herein replaces any similar information contained elsewhere in the policy.

UT-COVPG (6-19)